# Richmond

## COMMONWEALTH OF VIRGINIA, EX REL. COUNTY OF WISE
## V. INTERSTATE RAILROAD COMPANY.

February 26, 1940.

Record No. 2217.

Present, All the Justices.

The opinion states the case.

*Fred B. Greear,* for the appellant.

*J. L. Camblos* and *E. H. Molthan,* for the appellee.

HOLT, J., delivered the opinion of the court.

This appeal is from an order of the State Corporation Commission denying the petition of Wise county for a review and correction of the Commission's tax assessment of

the property of the Interstate Railroad Company for the year 1938.

The principal assignment of error is the very broad and general one that the Commission erred in denying the petition for review and correction, followed by the almost equally general ones, that the Commission erred (a) in refusing to assess the property of the railroad company "at about the same percentage of its actual value or fair market value that is used in the assessment of other properties in Wise county" and (b) "in refusing to be guided in the assessment of the property of the Interstate Railroad Company subject to local taxation only by the system and custom of the officials of Wise county with regard to the assessment for taxation of other similar properties of the county."

However, from the petition for correction filed before the Commission, and from the course of the evidence and the argument, we gather that, in the main, the more specific objections of the county to the assessment are: (a) That in point of ratio to market value it is out of line with the assessments of other property in the county, and hence unfair to the owners of such other property; (b) that the rate of reduction in the assessment is unjustifiably higher than in the cases of the other railroads in the county; (c) that in treating 50% of the roadbed and tracks as personal and not as real property the Commission acted arbitrarily and contrary to the generally accepted legal theory; and (d) that in classifying as industrial spurs, and hence of substantially lower taxable value, certain tracks which always prior to the assessment in question had been classed as branch lines, the Commission again acted arbitrarily.

The Interstate Railroad is a coal carrier whose main line extends from Andover to Miller Yard, 29.02 miles, where it connects with the Carolina, Clinchfield & Ohio Railway. It has seven branch lines varying in length from approximately 1½ to 7½ miles and totaling 24.04 miles. All except a mile and a fraction of the road is located in Wise county.

According to exhibit introduced by the Commission, and based upon figures from the Valuation Bureau of the Interstate Commerce Commission, the cost of reproducing the road new as of January 1, 1938, was shown to be $4,007,933. This exhibit shows the "per cent condition," weighted average, of the Interstate to be 63.06 per cent, or a depreciation of 36.94 per cent, resulting in a net replacement value of $2,527,391. The assessed value of the road for tax purposes for the year 1938 was fixed by the Commission at $648,144. This figure is about 26 per cent of the replacement value, as shown by the exhibit, as compared with the equalization ratio of 30 per cent used by the Commission in arriving at the assessment.

For the year 1926 the assessed value of the road was $1,084,231, and it continued at approximately that figure until 1935, when it was reduced to $894,603. For 1936 it was $893,378; for 1937 it was $857,522; and then, as stated, for 1938, the year now in question, the assessed value was placed by the Commission at $648,144, or $209,378 less than it was in 1937, and 40% less than it was in 1926.

In a graph prepared by L. M. Hillman, Jr., Commissioner of Revenue for Wise county, and who testified in behalf of the county, there are shown assessments of different classes of property in that county for the year 1938 in comparison with the assessments of the same property in 1926. Taking 100 as the index number for the assessed value of all property in the county for the year 1926, and comparing the assessed value for 1938 with that index number, the following is shown:

Town Lots and Improvements.............100%
Non-Mineral Lands ..................... 97%
All Railroads ........................... 78%
Mineral Lands and Improvements........ 75%
Interstate Railroad ..................... 60%

The same witness furnished a table showing the assessed value of each of the five railroads in the county for the year

1938 as compared with the assessed value of each in 1926, as follows:

|  | 1926 | 1938 | Reduction |
|---|---|---|---|
| Norfolk & Western | 100 | 97 | 3% |
| Louisville & Nashville | 100 | 85 | 15% |
| Virginia & Southwestern | 100 | 85 | 15% |
| Clinchfield | 100 | 76.5 | 23% |
| Interstate | 100 | 60 | 40% |

Exhibit No. 7 filed by Mr. Hillman was stated by him to be a copy he made from the records of the Tax Department of the State Corporation Commission. It is on the printed form and purports to be a copy of.the tax return of the Interstate Railroad Company to the Commission for the year 1938, together with parallel figures inserted by Mr. Hillman on the copy of the return and showing the assessed amount of each item and the total, as determined by the Commission's assessor. According to that paper, the company placed the total value of its road for that year at $790,302, which the exhibit shows was reduced by the Commission's assessor to $593,703. However, other parts of the record show various sums as the total amount of the assessment, such as $631,848, $655,359 and $648,144. Apparently the last of the three sums just named was the figure finally arrived at. It should be stated, however, in this connection that the Commission's assessor testified that before the tax return for the year 1938 was prepared by the company, the latter had made some overtures for a reduction in the assessment of certain structures on the line, and that he had suggested that the return be made on the basis of the previous year and that he would then consider the question of reducing the assessment. This may, and perhaps does, explain the unusual feature that the total value given by the company in its tax return was larger than that fixed by the assessor.

This reduction in the total assessment resulted from changing the rate of valuation of the main line from $16,000

per mile to $14,000 per mile, and from changing the valuation of the seven branch lines from $8,000 and $12,000 per mile to a uniform $5,000 per mile, except in the case of the Exeter Branch, which was valued at only $500, due to the fact that the mine was not in operation.

The change in the valuation of the branch lines seems to have come about by a change in the classification of those lines. There is such lack of definiteness and clarity in the testimony and briefs, and the record as a whole is so confusing on the point, that we have had much difficulty in ascertaining just what parts of the road this change in classification covered. As stated, apparently it related to what are referred to in the record as branch lines, by which we understand is meant the seven lines leading from different points on the main line to the coal mines served by the road. Again apparently, the classification of these seven lines, which always theretofore had been regarded and classified as branch lines, and as such rated as of a certain value per mile, was changed to industrial spurs, which are rated as of considerably lower value.

Assuming that that was what was done by the Commission, the important question is presented as to whether it erred in taking, or in concurring in, such action. Certainly at first blush it scarcely seems permissible to classify lines, some of which are from $5\frac{1}{2}$ to $7\frac{1}{2}$ miles in length, as mere spurs. Indeed, according to the blueprint filed as an exhibit, the somewhat fan-shaped or octopus tentacled branches at the Andover end of the Interstate Railroad have more the appearance of extensions of the main line than spurs or even branch lines. Furthermore, in the Interstate Commerce Act "spurs" are grouped with "industrial," "team," "switching" and "side" tracks. (I. C. C. Act., sec. 1, subsec. (22), 49 U. S. C. A., sec. 1(22). See also, sub-section (3)). This, we think, sheds considerable light upon the matter immediately in hand, and tends definitely and strongly to show that to call stretches of track such as those now under investigation as belonging to a group of the character recited in the Act referred to is not warranted.

Nor do we think that the fact that in its periodical report to the Interstate Commerce Commission the railroad company changed the classification of parts of its trackage from branch lines to spurs, and that that body accepted the report, is in itself convincing, or even of significance, as to the propriety or validity of the change. In the absence of an objection from some party in interest the matter probably was handled as one of mere routine.

In a matter such as this, we recognize that names and designations ordinarily are not in themselves important. The real question is one of valuation, irrespective of the name by which the subject may be called. But in dealing with that question it must not be overlooked that a mere difference in terminology may mean a difference in classification; and the latter may, and usually does, mean a difference in imputed value. The case in hand is an illustration. As branch lines the parts involved for years took a certain classification, which meant also the applying of a certain unit rate in ascertaining their value for tax purposes; whereas precisely the same parts, when designated as industrial spurs, took a different and lower classification and hence quite a substantially lower unit rate of appraisal. Therefore, the factual, legal and economic propriety of the action of the Commission in changing the designation, and thereby the classification, of the parts of the Interstate Railroad formerly known as branch lines to industrial spurs, would seem to be the point upon which the decision of this case largely turns.

In our opinion the evidence fails to show facts which would constitute adequate reason or justification for the change. Apparently the feasibility of operating a Mallet-type locomotive over the tracks, trestles and bridges was regarded by the assessor as a fair, appropriate and controlling test in determining the class in which these lines should be placed. But such a test is by no means conclusive and in certain conditions may be without value. There are probably many main lines throughout the country over whose trestles and bridges these ponderous machines could

not move with safety, and, in the instant case, even if the tracks, trestles, bridges and curves were adapted to their use, it is not likely that they would in fact be used for the type of service necessary in moving coal cars from the mines to the main line.

From the time the road was first built, which appears from the record to have been about the year 1920, down to 1938, the parts in question were treated, designated and classified as "branch lines." To change this classification from "branch lines" to "spurs" some good reason should be shown. Plainly there is nothing in the physical situation to warrant it. The only reason that suggests itself is that it was done for the purposes of taxation. Figures reproduced in the earlier part of the opinion and by others in the record show that the assessment under review is out of line with the assessments of other railroads operating in Wise county and of property in the county generally. The reduction for 1938 as compared with previous years, particularly 1937, is said to have been due to what was revealed by a personal inspection of its line made by the Commission's assessor, the first inspection in some years. The evidence, however, shows that as to the seven branch lines, the lowering of the assessments of which accounts for most of the total reduction, the assessor made a personal inspection of only one of them, and that that was from an automobile and not from a track velocipede or from a track motor car, or in any other appropriate and effectual way. The proof shows, furthermore, that whereas the assessment on a certain branch line had been reduced because of the falling off in the amount of tonnage hauled over it, yet no raising effect was given when later that branch showed a marked increase in tonnage over a period of substantial duration.

Counsel for the railroad company have cited *Norfolk & Western Railway Co.* v. *Commonwealth*, 148 Va. 630, 139 S. E. 281; *City of Norfolk* v. *Snyder*, 161 Va. 288, 170 S. E. 721, and other cases, which recognize the general rule that an assessment as made by the tax authority is pre-

sumed to be correct and valid. That is one of the elementaries of tax law; but that presumption, like most other presumptions of fact, is only *prima facie* and subject to rebuttal. In fact, it is little more than a starting point, and does not in any measure relieve the courts of the responsibility and duty of careful review, which the right of appeal itself implies. We have not lost sight of the fact that the judgment of the State Corporation Commission is presumed to be correct and is conclusive as to facts when there is any real conflict of evidence.

█ This case is remanded to that Commission, which will ascertain the assessed value of these branch lines as such, and, in doing this, the rate of assessment fixed as to other roads and as to property generally in the county is to be remembered.

Other matters are set out in the petition for appeal but that with which we have dealt covers the relief to which petitioner is entitled.

*Reversed and remanded.*

GREGORY, J., dissenting.