# Richmond

CITY OF RICHMOND v. COMMONWEALTH OF VIRGINIA, EX REL.

November 22, 1948.

Record No. 3389.

Present, All the Justices.

*Horace H. Edwards, J. Elliott Drinard, Wm. S. Cudlipp, Jr.* and *Henry R. Miller, Jr.,* for the appellant.

*J. Lindsay Almond, Jr., Attorney General, Blake T. Newton, Jr., T. Justin Moore, E. Randolph Williams, Patrick A. Gibson, F. M. Rivinus, J. J. McLaughlin, W. C. Plunkett, S. Burnell Bragg, J. L. Camblos, Albert H. Sandt, Chas. T. Abeles, Thomas B. Gay, J. M. Townsend, W. D. Cardwell, Edw. M. Hudgins, D. H. Leake* and *Woods, Rogers, Muse & Walker,* for the appellees.

STAPLES, J., delivered the opinion of the court.

This is an appeal by the city of Richmond from an order entered by the State Corporation Commission on October 3, 1947, denying the city's application for the review and correction of the Commission's assessment of the value of certain real estate and tangible personal property belonging to the appellee, Virginia Electric and Power Company, located in the city. The gravamen of the complaint is that, instead of assessing the said properties for taxation by the city at their fair market value, the Commission assessed them at only forty per cent thereof. This was the result of applying a State-wide equalizing factor of forty per cent in order to conform to the average ratio which real and tangible personal property assessments made by local assessors in the respective counties and cities of the entire State bear to the true value of such properties. Since

this method of assessing railroads and other public utilities is now being employed by the Commission, the Appalachian Electric Power Company and ten steam railroad companies operating in Virginia were allowed to intervene in support of its validity.

The city contends that the Commission's assessment of these properties at less than actual market value is in violation of sections 168 and 169 of the Virginia Constitution.

Section 169 provides that, "except as hereafter provided, all assessments of real estate and tangible personal property *shall be at their fair market value,* to be ascertained as prescribed by law." (Italics ours)

Section 168 of the Constitution contains this provision: "All property, except as hereinafter provided, shall be taxed; all taxes, whether State, local or municipal, *shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax,* and shall be levied and collected under general laws." (Italics ours)

The city contends that the assessments of similar property owned by individuals and private corporations which have been made by its local assessors are at full market value, and the Commission is required by section 168 to conform thereto and to use the same true value in assessing the properties of the power company in the city of Richmond.

If the above were the only constitutional provisions bearing on the question, and *if the properties of railroads and other utilities have not been differently classified for purposes of taxation* by the State Constitution and statutes bearing on the subject, the disparity in the respective assessments of these properties would seem to be in violation of the requirement of uniformity prescribed by section 168. If, however, they have been classified differently from the properties assessed by the Richmond assessing officers, then they are not "the same class of subjects" and the uniformity requirement of section 168 has no application to the assessment of their values by the Commission. This section requires only that taxes be uniform upon "the same class of subjects."

Section 176 of the Constitution of 1902 places upon the

State Corporation Commission the duty of assessing the value of the roadbed and other real estate, rolling stock, and all other tangible personal property, of each *railway* corporation and the property of every *canal* corporation.

Section 169 of the Constitution was amended in 1928 so as to provide that as long as the State shall levy upon *any public service corporation,* other than a railway or canal company, a State franchise, license, or other tax, based upon or measured by its gross receipts, or gross earnings, its real estate and tangible personal property *shall be assessed for taxation by the State Corporation Commission,* or other central State agency, in the manner prescribed by law. A franchise tax of the type referred to is imposed on the appellee power company. Therefore its properties must be assessed by the Commission and not by the city officers who assess the properties of others than the public service corporations which are taxed in this manner.

We are called upon then to consider whether the provisions of the Virginia Constitution and statutes could lawfully have had the effect of placing the properties of railroads and other public service corporations in a different class of subjects of taxation from the properties assessed by the assessing officers of the city of Richmond.

The general rule with respect to the classification of subjects of taxation is thus stated in 51 Am. Jur., Taxation, section 173, pp. 230-231:

"It is everywhere agreed that neither the Fourteenth Amendment to the Federal Constitution nor the equality and uniformity requirements of the state constitutions prohibit the making of classifications in state legislation relating to taxation. The power of a state to make reasonable and natural classifications for purposes of taxation, it has been said, is clear and not questioned. Such classifications may be made with respect to the subjects of taxation generally, the kinds of property to be taxed, the rates to be levied or the amounts to be raised, *or the methods of assessment, valuation, and collection.* Granting the power of a state to make classifications in tax matters, it has been

said, we must then grant the right to select the differences upon which the classification shall be based." (Italics ours).

And the same volume of Am. Jur., section 191, p. 253, adds the following:

■ "The fact that the legislature may place corporations generally in a separate class for purposes of taxation does not mean that it is prohibited from making reasonable discriminations between various kinds of corporations or companies. Thus, street railways and steam railroads may be separately classified, as may surface and subsurface street railroad companies. A similar view has been taken with respect to railroad corporations and sleeping, dining, and palace car companies, railroad corporations and other public utilities, railroad companies owning and operating trackage within the taxing state and those that do not, express companies employing railroad and steamboat companies to furnish transportation and companies doing an express business but owning their own means of transportation, * * *."

The above quoted text is abundantly sustained by the decisions of this court. In *Virginia Elec., etc., Co.* v. *Commonwealth,* 169 Va. 688, 194 S. E. 775, the Virginia Electric and Power Company contended that the imposition upon it of a tax on gross receipts from its bus operations, as well as from its electric lines, constituted an unlawful discrimination against it because no such tax is imposed on other corporations conducting the same or similar business. After pointing out that there was no other company which conducted "a single uniform transportation system, partly by rail and partly by motor vehicle, in any municipality similar to appellant," we held that the discrimination in the taxes imposed was justified because the classification of the Virginia Electric and Power Company separately from the other bus companies was supported by a substantial difference in its business. In the course of his opinion, Mr. Justice Hudgins (now Chief Justice) quoted with approval the following from *State Board of Tax Com'rs* v. *Jackson,* 283 U. S. 527, 51 S. Ct. 540, 75 L. Ed. 1248, 73 A. L. R. 1464:

"The power of taxation is fundamental to the very existence of the government of the States. The restriction that it shall not be so exercised as to deny to any the equal protection of the laws *does not compel the adoption of an iron rule of equal taxation,* nor prevent variety or differences in taxation, or discretion in the selection of subjects, or the classification for taxation of properties, businesses, trades, callings, or occupations.

" 'It is not the function of this court, in cases like the present, to consider the propriety or justness of the tax, to seek for the motives, or to criticize the public policy which prompted the adoption of the legislation. Our duty is to sustain the classification adopted by the legislature, if there are substantial differences between the occupations separately classified. *Such differences need not be great.* The past decisions of the court make this abundantly clear.' *Richmond Linen Supply Co.* v. *Lynchburg,* 160 Va. 644, 169 S. E. 554, 555; *National Linen Service Corp.* v. *Lynchburg,* 291 U. S. 641, 54 S. Ct. 437, 78 L. Ed. 1039."

*Pocahontas Consol. Collieries Co.* v. *Commonwealth,* 113 Va. 108, 73 S. E. 446, involved the validity of a tax on the recordation of deeds imposing the full amount of the tax on all grantors in deeds of trust and mortgages, *except railroads and internal improvement companies* whose lines are only partly in this State. In case the latter were grantors, it was provided that the full tax should not be required, but the tax should be prorated in the same proportion as the number of miles of the grantor's line in Virginia bears to the whole number of miles of lines conveyed by the deed. We held that such a classification of these respective grantors for purposes of taxation was based upon a reasonable distinction and was a valid exercise of legislative power.

In *Caskey Baking Co.* v. *Commonwealth,* 176 Va. 170, 10 S. E. (2d) 535, a tax was imposed upon all peddlers, except manufacturers of the article peddled, distributors of manufactured goods, and licensed wholesale dealers. This we held to be a reasonable classification for exemption from the tax, because the exempted classes were taxed otherwise,

and therefore the tax on peddlers not otherwise taxed did not constitute an unlawful discrimination against the peddlers of a West Virginia bakery. In affirming this case, the Supreme Court of the United States, in an opinion by Mr. Justice Roberts, said:

"* * * As we have repeatedly held, the equal protection clause of the Fourteenth Amendment does not prevent a state from classifying businesses for taxation or impose any iron rule of equality. Some occupations may be taxed though others are not. Some may be taxed at one rate, others at a different rate. Classification is not discrimination. It is enough that those in the same class are treated with equality. That is true here." (*Caskey Baking Co. v. Commonwealth of Virginia*, 313 U. S. 117, 121, 61 S. Ct. 881, 85 L. Ed. 1223).

Numerous decisions of this court to the same general effect as those above referred to are cited in Michie's Digest of Virginia-West Virginia Reports, Vol. 9, page 430, and in the Permanent Supplement thereto, Vol. 5, pages 5-6.

The question whether the fact that the subject of taxation is railroad property constitutes, in and of itself, a proper basis for placing such property in a separate classification has been frequently considered by the Supreme Court of the United States. It has been uniformly held that, where the legislation of a State provides for such classification, the resulting lack of uniformity does not offend the equal protection or due process clauses of the Fourteenth Amendment.

In one of the early, but leading, cases on the subject, *Cincinnati, etc., R. Co.* v. *Commonwealth of Kentucky* (usually cited as "Kentucky Railroad Tax Cases"), (1885), 115 U. S. 321, 6 S. Ct. 57, 29 L. Ed. 414, 419, the following was said:

"* * * The whole matter is left to the discretion of the legislative power, and there is nothing to forbid the classification of property for purposes of taxation and the valuation of different classes by different methods. The rule of equality, in respect to the subject, only requires the same means and methods to be applied impartially to all the con-

stituents of each class, so that the law shall operate equally and uniformly upon all persons in similar circumstances. *There is no objection, therefore, to the discrimination made as between railroad companies and other corporations in the methods and instrumentalities by which the value of their property is ascertained.* The different nature and uses of their property justify the discrimination in this respect which the discretion of the Legislature has seen fit to impose.

"So, *the fact that the Legislature has chosen to call a railroad, for purposes of taxation, real estate,* does not identify it with farming lands and town lots, in such a sense as imperatively to require the employment of the same machinery and methods for all, in the process of valuation, for purposes of taxation. *Calling them by the same name does not obliterate the essential differences between them. * * *.*" (Italics ours).

And continuing:

"* * * The right to classify railroad property as a separate class for purposes of taxation grows out of the inherent nature of the property and the discretion vested by the Constitution of the State in its Legislature, and necessarily involves the right, on its part, to devise and carry into effect a distinct scheme, with different tribunals, in the proceeding to value it. If such a scheme is due process of law, the details in which it differs from the mode of valuing other descriptions and classes of property cannot be considered as a denial of the equal protection of the laws."

In the most recent case from the Supreme Court involving the classification of railroad property for taxation, *Nashville, etc., Railway* v. *Browning,* 310 U. S. 362, 60 S. Ct. 968, 84 L. Ed. 1254, many decisions of that court since the Kentucky Tax Cases are cited, discussed, and distinguished. The case bears a striking similarity to the one at bar. The two chief differences are, first, that there the discrimination was against the railroad, while here it is claimed by the city that the assessments are discriminatory in favor of the railroads and against other owners of property in Richmond. Also, secondly, *the constitutional and statutory provisions of*

*Tennessee* apparently prohibited discrimination even when property had been differently classified for tax purposes. An equalization board had been provided to bring about uniformity of assessments among the properties, even though differently classified. The railroad company claimed this board had not performed that function with respect to its property. Because of the similarity of the questions involved, we will quote at length from the *Browning Case*.

The question presented to the court was thus stated in its unanimous opinion delivered by Mr. Justice Frankfurter:

"* * * The Railway first asserts that it is a victim of such invidious discrimination in the administration of Tennessee's tax statutes as is proscribed by the guaranty of 'the equal protection of the laws.' The claim is founded upon the following circumstances. As we have already indicated, there are two separate modes for the assessment of property in Tennessee, each with its distinctive procedure. The property of public service corporations is assessed by the Commission; all other property by local officials. *This broad classification, separating two very different types of property*, has been reflected, according to petitioner's contention, *by a corresponding difference in the bases of assessment.* For more than forty years, so it was urged before the courts of Tennessee and later here, the county assessors have systematically valued property at far less than its true worth, while utility and railroad properties have been assessed by the Commission at full value." (310 U. S., p. 366. Italics ours).

In discussing this claim of the railroad company, the opinion continues:

"* * * It must be emphasized that the Company makes no claim that its property is singled out from among other public service corporations for discrimination. Its asserted grievance is common to the whole class. We must put to one side therefore all those cases relied on by the petitioner which invoked the Fourteenth Amendment against discriminations invidious to a particular taxpayer. *Raymond* v. *Chicago Union Tract. Co.*, 207 U. S. 20, 28 S. Ct. 7, 52

L. Ed. 78, 12 Ann. Cas. 757; *Sunday Lake Iron Co.* v.
*Wakefield Tp.*, 247 U. S. 350, 38 S. Ct. 495, 62 L. Ed. 1154;
*Sioux City Bridge Co.* v. *Dakota County*, 260 U. S. 441,
43 S. Ct. 190, 67 L. Ed. 340, 28 A. L. R. 979; *Bohler* v.
*Callaway*, 267 U. S. 479, 45 S. Ct. 431, 69 L. Ed. 745;
*Cumberland Coal Co.* v. *Board of Revision*, 284 U. S. 23,
52 S. Ct. 48, 76 L. Ed. 146; *Iowa-Des Moines Nat. Bank*
v. *Bennett*, 284 U. S. 239, 52 S. Ct. 133, 76 L. Ed. 265.
All these cases are inapposite. None denied power to a
state to apply different yardsticks to different classes of
property. *Equally irrelevant are those cases in which this
Court, because of the nature of the litigation, was constru-
ing the uniformity clause of a state constitution, and was not
applying the Fourteenth Amendment.* Greene v. *Louis-
ville, etc., R. Co.*, 244 U. S. 499, 37 S. Ct. 673, 61 L. Ed.
1280, Ann. Cas. 1917E, 88; *Louisville, etc., R. Co.* v. *Greene*,
244 U. S. 522, 37 S. Ct. 683, 61 L. Ed. 1291, Ann. Cas.
1917E, 97. * * *." (310 U. S., at pages 367-368, 60 S.
Ct., at page 971. Italic ours).

And further:

"That the states may classify property for taxation; may
set up different modes of assessment, valuation and collection;
may tax some kinds of property at higher rates than others;
*and in making all these differentiations may treat railroads
and other utilities* with that separateness which their dis-
tinctive characteristics and functions in society make appro-
priate—these are among the commonplaces of taxation and of
constitutional law. *Kentucky Railroad Tax Cases*, 115 U. S.
321, 6 S. Ct. 57, 29 L. Ed. 414; *Pacific Exp. Co.* v. *Seibert*,
142 U. S. 339, 12 S. Ct. 250, 35 L. Ed. 1035; *Florida Cent.,
etc., R. Co.* v. *Reynolds*, 183 U. S. 471, 22 S. Ct. 176, 46
L. Ed. 283; *Southern Ry. Co.* v. *Watts*, 260 U. S. 519, 43
S. Ct. 192, 67 L. Ed. 375; *Atlantic Coast Line R. Co.* v.
*Daughton*, 262 U. S. 413, 43 S. Ct. 620, 67 L. Ed. 1051;
*Brooklyn, etc., Transit Corp.* v. *New York*, 303 U. S. 573,
58 S. Ct. 721, 82 L. Ed. 1024. Since, so far as the Federal
Constitution is concerned, a state can put railroad property
into one pigeonhole and other property into another, the

only question relevant for us is whether the state has done so. * * * Here, according to petitioner's own claim, all the organs of the state are conforming to a practice, systematic, unbroken for more than forty years, and now questioned for the first time. It would be a narrow conception of jurisprudence to confine the notion of 'laws' to what is found written on the statute books, and to disregard the gloss which life has written upon it. Settled state practice cannot supplant constitutional guarantees, but it can establish what is state law. The equal protection clause did not write an empty formalism into the Constitution. Deeply embedded traditional ways of carrying out state policy, such as those of which petitioner complains, are often tougher and truer law than the dead words of the written text. Compare *Carino* v. *Insular Government*, 212 U. S. 449, 459, 29 S. Ct. 334, 336, 53 L. Ed. 594. And if the state supreme court chooses to cover up under a formal veneer of uniformity the established system of differentiation between two classes of property, an exposure of the fiction is not enough to establish its unconstitutionaliity. Fictions have played an important and sometimes fruitful part in the development of law; and the equal protection clause is not a command of candor. * * *.". (310 U. S., at pages 368-369, 60 S. Ct., at page 972). (Italics ours).

■ The opinion in the foregoing case may be said to establish the following principles:

1. That the provision for assessing properties of railroad companies by the Commission, and other properties by the local assessing officers, constitutes in and of itself a "broad classification" separating these "two very different types of property."

2. That taxes levied by the State or its political subdivisions which discriminate in favor of one of these types or classes and against the other do not violate the equal protection or due process clauses of the Fourteenth Amendment.

We now come to the question, whether the real and tangible personal properties of railroads and other public

service corporations *have actually been placed* by the Constitution and statutes of Virginia in a class of taxable subjects, separate and apart from the properties of individuals and ordinary private corporations. In considering this question, it will be helpful to review briefly the history of the various provisions relating to the assessment of these types of property. Since the existing method of assessing the properties of the appellee company was developed from the system prescribed for assessing the properties of *railroad companies,* we will give our attention first to the origin and expansion of the constitutional and statutory provisions relating to the taxation of railroads.

By the Acts of 1870-71, page 93, it was provided that the railroads themselves should assess their properties for State taxation, and pay the taxes thereon directly into the State Treasury. In the year 1871 the county of Washington assessed county taxes upon the real estate of the Virginia and Tennessee Railroad Company. The company challenged the authority of the county to levy such a tax and the controversy was brought to this court in the case of *Virginia, etc., R. Co.* v. *Washington County,* 30 Gratt. (71 Va.) 471. We held that the county assessors had no authority to *assess* properties of the railroad for taxation, and, therefore, the county was without power to levy the tax. We also held that the uniform policy of Virginia had been to assess a railroad as a whole; that "It would be almost as easy and reasonable to divide a house or a locomotive into portions and assess each portion separately as to divide a railroad into portions and assess each portion of it separately."

As a result of this decision, Chapter 106, page 82, of the Acts of 1879-80, granted authority to the supervisors of a county to levy a tax upon the real estate of a railroad company located within the county. It was required, however, that the tax should be at the same rate as that imposed upon other property for county and school purposes, and "*based upon the assessment per mile*

*of the same property made by the state for its purposes."*
It is significant that this act did not confer upon the county assessing officers any authority to assess the value of the railroad's property for tax purposes.

By Chapter 76, page 78, of the Acts of 1897-98, the method of assessing the properties of railroads for taxation was changed. The companies were required to report all of their real and personal property of every description to the auditor of public accounts, showing in what counties or corporations the property was located. The auditor was required to lay the report before a newly created State agency, the Board of Public Works, and it was the duty of this board to "proceed to ascertain and assess the value of the property as reported, upon the best and most reliable information that can be procured, * * *." It was further provided that the secretary of the board should furnish to the proper officers of the counties and cities wherein the property assessed was located a certified copy of its assessment *for purposes of local taxation.*

Section 176 of the Constitution of 1902 effected another change with respect to such assessments. The State Corporation Commission was thereby created and charged with the duty of ascertaining and assessing *"in the manner required of the board of public works"* the value of the roadbed, and other types of real and personal property, belonging to railroad companies, while section 171 provides that real estate and tangible personal property (except the rolling stock) of public service corporations shall be assessed for local taxation in such manner as may be prescribed by the General Assembly.

Section 215 of the Tax Code requires the clerk of the State Corporation Commission to furnish to the council and commissioner of revenue of every city and town, and to the board of supervisors and commissioner of revenue of every county, wherein any property belonging to any railroad corporation is situated, a certified copy of the assessment made by the State Corporation Commission of such corporation's property, showing the character of

the property, its value and location, for purposes of taxation, so that appropriate local levies may be laid upon the same. Section 216 of the Tax Code provides that there shall be local levies upon said properties *at the same rate or rates* as are assessed upon other real estate and tangible personal property located in such localities, and *on the valuation fixed by the State Corporation Commission* in its assessment. Section 216 of the Tax Code also imposes a State tax on the rolling stock of all corporations operating railroads by steam at the rate of two dollars and fifty cents on each one hundred dollars of the assessed value thereof, and provides that there shall be no local levies on such rolling stock. This section also requires every such railway and canal corporation to pay to the State an annual franchise tax based upon a percentage of its gross transportation receipts. Section 228 of the Tax Code contains substantially the same provisions as to the assessment and taxation of real estate and tangible personal properties of water, heat, light, and power companies, as those we have outlined above with respect to railroads. Section 229 of the Tax Code likewise imposes an annual State franchise tax upon these companies based upon a percentage of their gross receipts and similar to that imposed on railroads. In view of the imposition of this tax measured by gross receipts, assessment of the properties of the appellee power company by the State Corporation Commission or other State agency became mandatory under the above mentioned provisions of section 169 of the Constitution.

To return to the procedure immediately following the adoption of the Constitution of 1902, sections 27-36 of Chapter 148, page 155, of the Acts of 1902-3-4, implemented the above mentioned provisions of the Constitution, providing for the assessments of the real and tangible personal properties of railroads. Section 176 of the Constitution provided that such assessments should be made in the manner then provided by Chapter 76 of the Acts of 1897-1898 for the Board of Public Works. Few

changes were made in that chapter. One new provision was contained in section 28 of the 1902-3-4 act as follows:

"The real and personal property of such corporation, other than its franchise, shall be assessed *on the valuation fixed by the State Corporation Commission* with county, city, town, district, and road levies, at the same rate as real and personal property of natural persons are assessed with such levies." (Italics ours.)

The method at that time provided by law for the assessment of real estate and tangible personal properties of individuals and ordinary private corporations was substantially the same as that now being followed. Real estate was assessed by county or city boards of assessors, subject to review by local equalization boards, and tangible personal property was assessed by the commissioners of the revenue of the respective counties and cities. No equalization board was empowered to review or alter the assessments made by the Commission.

From a consideration of the different methods employed in assessing the properties of railroads, it is obvious that the effect of the constitutional provisions on the subject was to place these railroad properties in an entirely separate category or class for the purposes of taxation as well as of ascertaining the taxable values to be assessed upon them. A different assessing agency was utilized than was provided for county and city assessments. Neither the Commission nor the local assessing agency was authorized to establish a standard of values or a percentage of values to which the other was required to conform. Since, as we have repeatedly held, it is a matter of common knowledge that local assessing officers have almost invariably undervalued the real and tangible personal properties assessed by them for taxation, it was a foregone conclusion that the respective taxable values arrived at by these separate assessing agencies would not bear the same ratio to true or actual values.

In view of this necessary result with respect to the inequality of the tax burden on their respective properties

which would fall upon railroads and other property owners, it cannot be doubted that the framers of the Constitution of 1902 intended to and did place the real and tangible personal property of railroads in an entirely separate tax classification. For many years prior to the adoption of the 1902 Constitution, it had been settled by the decisions of the Supreme Court of the United States that the equal protection clause of the Fourteenth Amendment required uniformity of the tax burden only upon persons and properties of the *same class*, and that it lay within the province of the State to classify its subjects of taxation, imposing on one kind of property one burden of taxation, and on another kind a lesser or greater burden. These decisions were reviewed at length in *Florida Cent., etc.; R. Co.* v. *Reynolds*, 183 U. S. 471, 22 S. Ct. 176, 46 L. Ed. 283, which was decided January 6, 1902, while the constitutional convention was in the course of its deliberations. In that case, as well as in the earlier *Kentucky Railroad Tax Cases*, *supra*, it was held that real estate of railroad companies constituted a legitimate subject of separate classification in the field of taxation.

The provisions of sections 128, 168, and 176, of the Constitution, as adopted in 1902, cannot be reconciled upon any hypothesis other than that the real and tangible personal properties of railroads were classified differently from similar properties of others which were required to be assessed by county and city assessing officers. Prior to the 1928 amendments, section 128 (which was then repealed) had provided as follows:

"In cities and towns the assesment of real estate and personal property for the purpose of municipal taxation, shall be the same as the assessment thereof for the purpose of State taxation, whenever there shall be a State assessment of such property."

■ The necessary effect of this provision was a separate classification for tax purposes of all properties, the value of which was assessed by a State agency for State taxes.

Section 176 provided that the Corporation Commission

should annually ascertain the value of the roadbed and other real and tangible personal properties of railway corporations, and that they "shall be taxed for State, county, city and district purposes." Therefore, the cities and towns were required to levy a local tax upon certain property of railroads on a fractional part allocated to them out of a total State-wide value assessed by the Commission, while similar property belonging to others was required to be taxed on values ascertained by local assessing officers. It is obvious that there could not be any uniformity in the ratio of assessed values to actual values arrived at by the Commission on the one hand, and by each of a hundred and twenty odd local assessing agencies of the authorities levying the tax on the other. Nor did the framers of the Constitution undertake to require such an impossible uniformity. Section 168 required that the taxes be uniform only "upon the *same class* of subjects," and railroad property was thus necessarily treated as being in a different class from the real and tangible personal properties of others. The values ascertained by the Commission were required to be certified to the counties and cities as to properties therein located, dividing among the localities on a proportionate basis the entire value of the railroad property assessed for State taxation. Clearly, this could not provide uniformity of local taxes levied on railroad property with local taxes levied on assessments made on other properties by local assessing officers. In fact, the provision of the Constitution itself, requiring these local taxes to be levied on railroad property at the valuation fixed for State taxes, was necessarily a prohibition against any attempt at equalization by the Commission with assessment ratios in the several cities and towns. The Commission had no authority whatever to make any changes or adjustments in values ascertained for State taxes to conform to local assessment valuations. Since the uniformity provisions of section 168 could not possibly be applied to such conditions, it follows that the framers of the Constitution considered railroad property as constituting a separate and

distinct class and not within the uniformity provisions. The Constitution is not to be construed as requiring the impossible.

The opinion of the Commission in this case expresses the following views:

"A consideration of the constitutional and statutory provisions which govern the assessment of the properties of public service corporations will reveal that a uniform plan for the assessment and taxation of public service companies has been evolved. In brief, the plan existing today, which is common to all such companies, provides for the imposition of *ad valorem* taxes by the several localities in the State upon the tangible properties of such companies. These taxes are imposed on the basis of assessments made or valuations fixed by the Commission. A second and integral part of the system provides that such companies shall pay a franchise tax measured by gross receipts which tax is devoted to the support of the State government. The constitutional and statutory provisions, providing for this dual method of taxing such companies, uniformly require that the Commission, in making the assessments or fixing the valuations of the tangible properties, must *exclude* such franchise value as may be inherent in such property."

Section 181 of the Constitution itself refers to the "system of taxation" set up for railway and canal companies and authorizes the General Assembly to change same in all respects, except that the Corporation Commission or another central State agency should administer any new system. This section also covered the contingency that the "system" might be declared unconstitutional by providing that "If the said system of taxation shall, for any reason become inoperative the General Assembly shall have power to prescribe some other system in lieu thereof, and to provide how and by what agencies it shall be administered."

That the method of taxing railroads amounts to a "system of taxation" different from that employed for taxation of other properties is thus expressly recognized both by the Commission and by the Constitution itself.

The chief differences in the system of taxation of railroads and individuals may be summarized as follows:

The railroads pay an annual franchise tax based upon gross receipts, but are relieved of the income tax which individuals and nonpublic service corporations are required to pay. (Constitution, sections 177, 178; Tax Code, section 216). Railroads also pay the following: A State tax of two dollars and fifty cents per hundred dollars of value on their rolling stock, while the localities are forbidden to tax same. Railroad companies also pay to the State a tax on money and on intangibles. All these taxes are assessed by the State Corporation Commission and paid directly into the State Treasury. (Tax Code, sections 215-216).

The Commission is required *annually* to assess the value of real estate of railroads for purposes of local taxation, while reassessments of the values of real estate by the local assessing officers is usually at intervals of five years or longer. In the assessments of the real estate of railroads, the company, itself, is required to make a report to the Commission showing the location of its properties and the fair market values thereof, and the Commission then makes the assessment. In fixing the valuations, the Commission is required to eliminate from consideration the value of the company's franchise, which is separately taxed. The assessment of the value of the roadbed and the major portion of the real estate is made as a whole, and fractional parts of the whole value are allocated to the counties, cities, and towns. No attempt is made actually to value separately the part situated in any particular locality.

In view of the wide differences in the methods of taxing railroads and assessing the values of their properties for taxation from those applicable to individuals and non-public service corporations, we conclude that the two types of properties are different classes of subjects of taxation, and that neither the Constitution nor the statutes of the State require that assessments of the real estate and tangible personal property of railroads be equalized in any manner

with assessments of similar properties of others which are made by the local assessing officers.

The statutes providing for the assessment of the real and tangible personal properties of electric and power companies follow the same general pattern as the provisions relating to railroads. It is clear that they also have been separately classified for purposes of taxation, and that the uniformity provisions of section 168 do not require the equalization of the assessments of their properties, which are made by the Commission, with those of other properties made by the local assessing officers.

Our conclusion that the Virginia Constitution does not require uniformity in the respective valuations of properties assessed for tax purposes by the Commission and those assessed upon a different class of properties by county and city assessing officers brings us to the consideration of the validity of the assessments made by the Commission which are here challenged by the appellant.

Although section 169 of the Constitution provides that "all assessments of real estate and tangible personal property shall be at their fair market value," it is conceded by all that the Commission assessed appellee's properties at only forty per cent of their fair market value. This, the Commission finds, was the average ratio of assessed values of real estate and tangible personal property fixed by local assessing officers in all the counties and cities of the State to the true values of such property assessed by them. The correctness of this ratio is not disputed, and the Commission used it in making its assessments of appellee's properties. Neither the appellee nor any railroad operates in every county or city of the State, but the extent of appellee's operations, comprising areas in sixty-four counties and seventeen cities, brings it within the category which the Commission considers should be considered, for tax purposes, as a State-wide industry.

The principle of relating, on the basis of a definite percentage, the valuations of railroad properties to the valuations of properties as fixed in local assessments seems to have stemmed from the decision of the Supreme Court in *Greene*

v. *Louisville, etc., R. Co.*, 244 U. S. 499, 37 S. Ct. 673, 61 L. Ed. 1280, Ann. Cas. 1917E, 88, which was decided in 1917. Exhibit No. 46 in the record before us is a letter dated September 17, 1927, from Commissioner William F. Rhea to the City Manager of Portsmouth, in which he explained the method employed by the Commission in the valuation of railroad properties. After pointing out that the average ratio assessed to actual sales values of real property through the State was 41.40 per cent, Commissioner Rhea said:

"* * * I think that you will agree that when the Commission has placed the value of railroad property on a parity with, or higher than the general average in the State, that it has performed its duty, and that it cannot depart from this principle is borne out in the case of *Greene* v. *Louisville, etc., R. Co.*, which was decided by the Supreme Court of the United States on June 11, 1917. * * *." Commissioner Rhea then quotes at length from the opinion in that case.

It also appears from the opinion of the Commission in this proceeding that it still adheres to the view expressed by Commissioner Rhea that the *Greene Case* requires uniformity of assessments of railroad property and the property of individuals and ordinary business corporations.

The decision in the *Greene Case*, however, as pointed out by Mr. Justice Frankfurter in the quotation, *supra*, from his opinion in *Nashville, etc., Railway* v. *Browning*, did not involve the Federal Constitution. Its conclusion and reasoning were based entirely on the uniformity requirements of the *Kentucky Constitution*. These requirements, it was held, were violated by the Kentucky assessing officers to the prejudice of the railroad. The opinion in the *Greene Case* said in this connection:

"The fact should be emphasized that the Kentucky court of last resort, far from holding that discrimination such as is here complained of is in accord with the Constitution and laws of the state, has recognized distinctly that it is not; but has felt constrained to hold that, under circumstances

similar to those of the present cases, there is no redress in the courts of the state; and that the constitutional provisions for equality and uniformity are capable of being put into execution only through the selection of proper assessing officers. *Louisville Ry. Co.* v. *Commonwealth*, 105 Ky. 710, 49 S. W. 486. This, while admitting the wrong, merely denies judicial relief, and is not binding upon the Federal courts." (37 S. Ct., at page 679).

The Supreme Court thereupon construed the *Kentucky Constitution* as not permitting discrimination in the assessment of properties even though they were not in the *same class* of taxable subjects. The Virginia Constitution, however, is to the contrary. It requires only that the taxes "shall be uniform upon the *same class* of subjects within the territorial limits of the authority levying the tax." The *Greene Case* turned primarily upon whether the Federal courts were empowered to grant relief from discriminations resulting from a violation of *state tax laws*. We are, therefore, constrained to hold that the principles with respect to uniformity of assessments required under the Kentucky law, enunciated in that case, are not applicable to the administration of the tax laws of Virginia here involved.

Judge Rhea's letter (Exhibit No. 46, *supra*) also quotes the following expression by Commission Chairman Robert R. Prentis (later Chief Justice of this Court):

"The Commission has assessed these propertiies at what is believed to be a fair value, taking all the circumstances into consideration, including the fact that the franchise value is otherwise reached for taxation in Virginia. It will be noted that in assessing these properties the Commission is expressly forbidden by the Constitution to include any franchise value in the assessment of the physical properties for taxation. We have found the problem a difficult one, but so far as we have been able to do so we have assessed the values of railway property in accordance with the directions of the Constitution."

Exhibit No. 47 is a letter dated September 17, 1927, written by Commissioner Louis S. Epes (later a Justice of

this court) to the Vice President of the Seaboard Air Line Railway Co., giving a comprehensive review of the procedure of the Commission in arriving at the *actual value* of railroad properties. He then explained why the actual value arrived at was reduced to forty per cent thereof in the Commission's assessments for taxation. His letter had the following to say on this subject:

"The Commission has taken into consideration the fact that in Virginia, the properties of individuals are not on the average assessed at 100% of the actual value thereof. From the best information that it can get, it is of opinion that, taking all classes of real estate and tangible personal property into consideration, the average ratio for Virginia of assessed value to actual value of property owned by individuals and ordinary business corporations is 40% or greater. And it has taken 40% as being a fair ratio of assessed value to actual value to be used in assessing the physical properties of steam railroads.

"In making its assessments, the Commission has tried to ascertain what is the fair value (100%) as of January 1, 1927, of the property being assessed; and then in general has taken 40% of this sum as the fair cash value for purposes of taxation.

*    *    *    *    *    *

"The value of these physical properties, which the Commission has tried to ascertain as the 100% basis to which to relate its assessments, is the actual value as of January 1, 1927, of the land and other physical properties of the railroad company exclusive of any franchise value, good will, 'going concern value,' 'cost of establishing the business,' or other 'intangible' value of the company."

It is significant that neither Chairman Prentis nor Commissioner Epes gave expression to any idea that the procedure followed *was required by any uniformity or equalization provision of either the State or Federal Constitution.* On the contrary, Commissioner Epes seems to express the thought that the Commission concluded that fairness and equity required it to bring its assessments of railroad properties in

line with those of other properties made by local assessment officers throughout the State.

As stated, it is not denied by appellant that the State-wide average of assessments of real and tangible personal properties made by the county and city assessors is forty per cent of the fair market values of said properties. We have repeatedly taken cognizance of this customary under-valuation by local assessors.

In *Lehigh Portland Cement Co.* v. *Commonwealth*, 146 Va. 146, 150, 135 S. E. 669, with respect to the requirement of section 169 of the Constitution that "all assessments of real estate and tangible personal property shall be at their fair market value," we said:

"That the provisions of the Constitution, in this respect are more observed in the breach than in the execution, is a matter of which the courts might well take judicial notice.

"It appears in proof, in the instant case, that the As-sessor of lands in 1920 of Pastures district of Augusta County, in which plaintiff's plant is situated, was in-structed by the State Tax Board, in making his assessment of land, to assess same at fifty per cent of actual values. This was done in order to make the assessments throughout the State more equal and uniform, it being realized that in many of the counties the assessments were abnormally low."

In *Roanoke* v. *Gibson,* 161 Va. 342, 348, 170 S. E. 723, we again said:

"In practice it has been the general custom in this State to undervalue property and to advance the rate, and so to a corresponding extent the letter of Section 169 of the Constitution has not been observed; * * * "

Likewise, in *Washington County Nat. Bank* v. *Washing-ton County*, 176 Va. 216, 218, 10 S. E. (2d) 515, we again pointed out that:

"The Constitution of Virginia, Section 169, declares that assessments of real estate shall be at their fair market value. But this mandate has been so honored in the breach that no assessors feel called upon to apply it in practice."

■ The practice in this State of undervaluing property for assessment purposes has been in effect for a great many years.

In the course of the debates in the Constitutional Convention of 1902, it was said by Delegate Parks:

"One of the evils of our system of taxation which prevails today and which gives rise to a great deal of dissatisfaction is the fact that neither land nor tangible personal property are assessed at their fair market value." (Debates, 1902, p. 2643).

Nor has the practice been confined to the Commonwealth of Virginia or to modern times. In 1 Bonbright, Valuation of Property, at pp. 504, 505, it is said:

" * * * the states solemnly levy a tax, called the general property tax, upon all property in the state, and then exempt certain types of personalty by statute, stand passively by while almost all of the remainder is withheld from the assessment rolls with the tacit approval of their officials, and permit absurd undervaluation of the residue.

"This situation is neither new nor distinctly American. Professor Seligman has found an escape of personal property from actual taxation in the Athenian, Roman, and medieval European fiscal systems. The development of the English general property tax bears a particularly strong resemblance. * * * . Already in the thirteenth century it was considered an unusual thing to tax personalty upon its full value; and in 1592, not five men in London were assessed at as much as £200 upon their goods.

*       *       *       *       *       *

"The escape of personalty from the general property tax in America is as old as the tax itself. * * * ."

In considering whether the State Corporation Commission, in the exercise of its duty to ascertain the taxable values of the properties of railroads and public service corporations, may deviate from the actual market values of such properties, we must accord great weight to the long-standing customs and practices which have prevailed and which have not heretofore been challenged. Does the

constitutional requirement for assessment of properties "at their fair market value" require the Commission to attribute a different meaning to those words than the local assessors of property have attributed to them? They apply equally to all assessors. The Commission has not thought the words had one meaning when applied to it and another for local assessors. Many years ago it concluded that it had the discretion to exercise the same latitude as local assessors in determining what constitutes "fair market value." It concluded that it would be inequitable and unjust to assess the properties of railroads and other public service corporations at one hundred per cent of their fair market value while properties of others, also required to be assessed at "fair market value" were assessed at forty per cent thereof. It, therefore, related the values assessed by it to those at which the other properties were assessed locally. This long standing practice has been well-known over the years. We took cognizance of it and gave it our implied approval in *Commonwealth* v. *Interstate R. Co.*, 175 Va. 53, 7 S. E. (2d) 130. There we held that the assessment value placed by the State Corporation Commission on certain branch lines of the railroad was unsupported by the evidence and we remanded the case to the Commission, with direction to "ascertain the assessed value of these branch lines as such, and, in doing this, the rate of assessment fixed as to other roads and as to property generally in the county is to be remembered."

The question whether the long-continued disparity in the values of the assessments by the Commission of real and tangible personal properties of railroads and public utilities, and in the corresponding values of assessments by Richmond assessing officers of such properties belonging to others, might run afoul of the equal protection clause of the Fourteenth Amendment has been ably discussed by counsel orally and in their respective briefs. If the properties should be considered as constituting one and the same class of subjects of taxation, the fact that the city assessing officers assessed the properties within their juris-

diction at one hundred per cent of fair market value (if this be true as claimed by the city), knowing that the property assessed by the Commission was intentionally reduced to forty per cent of its true value, might furnish occasion for complaint by the owners of the locally assessed properties that they have been discriminated against. However, if the respective properties have been *separately classified* for purposes of taxation, as we hold to be the case, it seems clear that such action by the local assessors was not a violation of equal protection.

On the whole case, in the light of the practices which have continued over the years, we cannot say that the action of the Commission, in making the assessment complained of at forty per cent of the fair market value of appellee's properties, constitutes an abuse of the authority and discretion confided to it by the Constitution and statutes of the State.

A voluminous mass of testimony and exhibits was introduced before the Commission relating to the factual question whether the values of other real and tangible personal properties assessed by the city were in excess of forty per cent of their fair market value. The Commission concluded from the evidence that such locally assessed values did not exceed that ratio. This finding the appellant has assigned as error, but in the view we have taken of the case it is not necessary for us to consider the question.

The order appealed from is affirmed.

*Affirmed.*