# Richmond

COMMONWEALTH OF VIRGINIA v. W. E. CROSS, TRADING AS VIRGINIA TOURS.

October 11, 1954.

Record No. 4278.

Present, Eggleston, Spratley, Buchanan, Miller, Smith and Whittle, JJ.

The opinion states the case.

*J. Lindsay Almond, Jr., Attorney General* and *Frederick T. Gray, Assistant Attorney General,* for the Commonwealth.

*Tucker, Mays, Cabell & Moore, Henry T. Wickham* and *Charles L. Reed,* for the appellee.

SMITH, J., delivered the opinion of the court.

This is an appeal of right by the Commonwealth from an order of the State Corporation Commission which granted W. E. Cross, trading as Virginia Tours, a refund of $350.98, the amount overpaid on his 1952 gross receipts road tax assessed under Code, § 58-638.[1] The sole question presented is whether the application for refund was filed "within one year from the date of the payment" of the tax as required by Code, § 58-1122.[2]

Under a certificate of public convenience and necessity issued by the Interstate Commerce Commission, Cross is authorized to transport, as a common carrier, passengers in charter parties in interstate commerce, and under a permit issued by the State Corporation Commission he is authorized

---

[1] Code, § 58-638 provides in part:

"*Rate of tax; levy.*—Except as hereinafter otherwise provided, every person who operates, or causes to be operated, on any highway in this State, any motor vehicle, trailer or semi-trailer for the transportation of property for compensation, whether for rent, or for hire, or as a contract carrier, or as a common carrier, and every common carrier by motor vehicle, trailer or semi-trailer of passengers, shall pay quarterly to the State Treasurer, on or before the fifteenth day of April, July, October and January of each year, in addition to any other fees and taxes imposed by law upon motor vehicles, trailers and semi-trailers, and upon the operation thereof, and in addition to any motor fuel tax paid or payable by such person, a road tax calculated on the gross receipts derived from such operations during the quarter year ending with the preceding month, * * * .

"The provisions of this section shall apply for the tax year beginning January first, nineteen hundred forty-nine, and annually thereafter until otherwise provided by law."

[2] Code, § 58-1122 provides in part:

"*Petition for correction of taxes, etc., assessed by State Corporation Commission.*—Any person or corporation feeling aggrieved by reason of any registration fee, franchise tax, charter tax, entrance tax, license tax, fee or charge assessed or imposed by or under authority of the State Corporation Commission * * * or any fee paid under the provisions of chapter 8 of Title 13, may, unless and except as otherwise specifically provided, within one year from the date of the payment of any such tax, fee or charge, apply to the State Corporation Commission for a correction of such assessment or charge and for a refund, in whole or in part, of the tax, fee or charge so assessed or imposed and paid; * * * ."

See also, Code, § 58-1125.

to transport, as a contract carrier, passengers in charter parties in intrastate commerce. In other words, when operating in interstate commerce he is a common carrier and when operating in intrastate commerce he is a contract carrier. Contract carriers of passengers are not subject to the tax here involved because in the transportation of passengers the statute applies only to common carriers. However, in submitting his quarterly tax reports for 1952, Cross, through error, included gross receipts derived from his operations as a contract carrier of passengers. As a result of this mistake he paid to the State Treasurer $350.98 more than the total tax due for 1952. On August 17, 1953, he filed his petition with the Commission for a refund of this amount.

An audit of Cross' books and records by the Division of Motor Carrier Taxation of the Commission, made on April 22, 1953 and filed on May 12, 1953, disclosed that for the first quarter of 1952 the amount of gross receipts tax actually due was $8.02 but that on April 15, 1952 Cross paid $141.21. For the second quarter the tax actually due was $148.97 but on July 14, 1952 Cross paid $419.62; for the third quarter the tax actually due was $49.39 and Cross made no payment for this quarter; and for the fourth quarter the tax actually due was $37.39 and Cross paid $33.92 on January 15, 1953. Thus, this audit shows that on July 14, 1952, Cross had paid $317.06 in excess of his total annual tax and that when he paid $33.92 on January 15, 1953 his total overpayment for the tax year of 1952 amounted to $350.98. These figures may best be understood by reference to the following table:

| Date of Report | Amt. of 1952 Tax Actually Due | Payment Made With Report | (+) (—) | Overpayment Underpayment |
|---|---|---|---|---|
| April 15, 1952.... | $ 8.02 | $141.21 | + | $133.19 |
| July 14, 1952..... | 148.97 | 419.62 | + | 270.65 |
| ................. | 49.39 | ...... | — | 49.39 |
| Jan. 15, 1953..... | 37.39 | 33.92 | — | 3.47 |
| Total....... | $243.77 | $594.75 | + | $350.98 |

A majority of the Commission held that since the application for refund was filed within one year from December 31, 1952, Cross was entitled to a refund of $350.98, the total amount paid in excess of his annual tax. Commissioner Catterall on the other hand concluded that since the petition for refund was filed on August 17, 1953, Cross could not recover any money paid by him before August 17, 1952, and therefore he was entitled to only $33.92, the amount paid on January 15, 1953.

The Commonwealth does not contend, and Commissioner Catterall did not hold, that the period of one year contained in Code, § 58-1122, as applied to § 58-638, runs from the date the taxpayer actually pays his quarterly estimates, but the Commonwealth does contend that the period of one year runs from the date the taxpayer pays more than he owes for the entire year, which in this case would be one year from July 14, 1952. Cross, on the other hand, contends that the one year period runs "from the date that the total annual tax is ascertained by the taxpayer and final payment thereof is made." In our view neither of these contentions is entirely correct.

The right to apply for the correction of an assessment and for a refund is purely a statutory right and it is incumbent upon one seeking relief to proceed according to the statute affording such relief. *Commonwealth* v. *Conner*, 162 Va. 406, 174 S. E. 862; *Commonwealth* v. *Columbian Paper Co.*, 143 Va. 332, 130 S. E. 421. The application must be made within the time required by the authorizing statute and in accordance with such restrictions or conditions as may be contained therein. *Lemmon Transport Co.* v. *Commonwealth*, 192 Va. 416, 65 S. E. (2d) 537; *Leesburg* v. *Loudoun Nat. Bank*, 141 Va. 244, 126 S. E. 196, and cases there cited.

Both the majority and minority opinions of the Commission, as well as the Attorney General, concede that the claim here considered arises out of a tax "assessed or imposed by or under authority of the State Corporation Commission" and

that Cross has properly brought his claim for refund under Code, § 58-1122.

The provisions of this section were not, however, drawn for the specific purpose of providing relief from taxes overpaid under Code, § 58-638, but it is a broad, general statute. Commissioner Catterall has accurately described it as a "catchall" statute which provides a remedy at law for any aggrieved taxpayer who has paid any fee, tax or charge pursuant to any statute administered by the Commission unless and except as otherwise specifically provided. *Railway Express Agency* v. *Commonwealth*, 196 Va. 368, 83 S. E. (2d) 421. This is a remedial statute whose purpose is to provide an expeditious and inexpensive remedy for relief against taxes which have been erroneously assessed and collected. Being a remedial statute it must be given a liberal construction with the view of advancing the remedy sought to be applied in compliance with the true intent and purpose of the legislature. *Ches., Etc., Tel. Co.* v. *Newport News*, 194 Va. 409, 73 S. E. (2d) 394; *Pembroke, Etc., Works* v. *Com.*, 145 Va. 644, 134 S. E. 721; *Commonwealth* v. *P. Lorillard Co.*, 129 Va. 74, 105 S. E. 683; *Com.* v. *Smallwood Mem'l Inst.*, 124 Va. 142, 97 S. E. 805.

While Code, § 58-638 requires a motor carrier to pay quarterly in each year a road tax calculated on the gross receipts derived from its operations during the quarter ending with the preceding month, the tax imposed is an annual tax. Section 58-638 so provides: "The provisions of this section shall apply for the tax year beginning January first, nineteen hundred forty-nine, and annually thereafter until otherwise provided by law." In addition to this specific language, Code, § 58-639, which exempts carriers whose "gross yearly earnings from operations subject to the tax imposed by § 58-638" do not exceed $5,000, provides that its provisions "shall apply for the tax year beginning January first, nineteen hundred fifty-two, and annually thereafter until otherwise provided by law."

In ascertaining the annual tax due under § 58-638 certain exemptions and credits are allowed and must be taken into

consideration before the correct annual tax liability is established. In addition to the $5,000 exemption allowed by § 58-639, under the provisions of §§ 58-638.1 and 58-638.2 amounts expended by carriers for tolls and charges for crossing toll bridges and ferries in this state and special taxes or fees paid the Federal Government for the right to operate over particular highways in this state are deductible from gross receipts in computing the amount of tax due. It is therefore apparent that although § 58-638 requires quarterly reports and quarterly payments, the annual tax, if any, for which the carrier is liable cannot always be ascertained until the carrier's operations for the year have been concluded and the carrier allowed credit for the applicable statutory exemptions and deductions. Thus, the true intent and purpose of the legislature was not to levy a quarterly gross receipts tax but an annual gross receipts tax payable in estimated quarterly installments.

The Commission recognizing that the refund statute is a broad, general statute and that the circumstances under which relief may be sought differ materially with respect to the nature of the tax assessed, concluded that when applied to Code, § 58-638, interpretative clarification was necessary as a guide to its employees and to the taxpayer seeking relief under its provisions. Accordingly, it issued a memorandum on September 12, 1949, entitled "Overpayments of Gross Receipts Road Tax," which is relied on by both Cross and the Commonwealth as upholding their respective positions. Although this memorandum is long and not free from ambiguity, as indicated by the fact that the members of the Commission are divided as to its proper interpretation, the majority of the Commission has found that it has "long been the uniform administrative policy of the Commission to consider the gross receipts taxes levied pursuant to § 58-638 as annual taxes, and the Commission in numerous cases has permitted refunds to motor carriers if the motor carrier filed a petition for refund within one year from the 31st of December of the year in which the tax liability accrued." In addition, the

administrative practice of the Commission has been to treat an excess payment of gross receipts tax for one quarter as a payment in advance for a later quarter in the same calendar year but not as a payment for any quarter in a later calendar year.

The legislature is presumed to be cognizant of the practical construction given to legislative enactments by administrative officials and acted upon by the people, and in the absence of legislation evincing a dissent, the courts will adopt that construction as decisive in cases of doubt. *Savage Truck Line* v. *Commonwealth*, 193 Va. 237, 68 S. E. (2d) 510; *Commonwealth* v. *Appalach. El. Power Co.*, 193 Va. 37, 68 S. E. (2d) 122; *Joyner* v. *Matthews*, 193 Va. 10, 68 S. E. (2d) 127; *City of Richmond* v. *Commonwealth*, 188 Va. 600, 50 S. E. (2d) 654; *Savage* v. *Commonwealth*, 186 Va. 1012, 45 S. E. (2d) 313; *Atlantic & D. R. Co.* v. *Lyons*, 101 Va. 1, 42 S. E. 932; *Smith* v. *Bryan*, 100 Va. 199, 40 S. E. 652.

It is clear that the one year limitation imposed by Code, § 58-1122 does not run on overpayments made during the tax year from the date the taxpayer makes a final payment, as contended by Cross, because the taxpayer, after having made overpayments in the tax year, might make only a token payment at any time after the end of the tax year and therefore recover the overpayments made during the tax year. Likewise, the one year does not run on overpayments made during the tax year from the date that the taxpayer pays more than he owes for the entire year, as contended by the Commonwealth, because then the diligent taxpayer who overpays during the tax year will invariably have less than one year in which to apply for a refund, while the delinquent taxpayer who overpays after the end of the tax year will have a whole year in which to file his application.

As pointed out above, the tax imposed by Code, § 58-638 is an annual gross receipts tax payable in estimated quarterly installments, and under the administrative practice of the Commission an excess payment of tax for one quarter is treated as a payment in advance for a later quarter in the same

calendar year but not as a payment for any quarter in a later year. The Commission's practice of treating an excess payment of tax for one quarter as a payment in advance for a later quarter in the same calendar year is in accordance with the true intent and purpose of the statute to refund to those who have paid more than is properly collectible. Therefore, we hold that the period of "one year from the date of the payment of any such tax," (annual gross receipts tax) runs from the end of the current tax year when the overpayment is made during that year, but when any overpayment is made at any time after the end of the current tax year the period of one year begins to run from the date of each such payment.

The following language of Commissioner King, Chairman, speaking for the majority of the Commission, illustrates the correctness of our conclusion:

"In the audit made by the Commission's Staff dated May 12, 1953 (Exhibit 1) it is shown that the carrier for the first quarter of 1952 had gross receipts subject to the tax of $401.24, and a tax liability of $8.02. The carrier actually paid $141.21 under the mistaken belief that certain non-taxable gross receipts were taxable. The Commission's audit made over a year after this payment resulted in a credit of $133.19 for the carrier. Were this a quarterly tax since the carrier's gross receipts subject to the tax did not amount in the quarter to either the $5,000 yearly exemption or the $1,250 quarterly exemption, if it is desired to put it on a quarterly basis, the carrier had no tax liability for the period. Clearly that was not the intention of the legislature. The carrier expected its annual operations to amount to more than $5,000 irrespective of the amount of business done in any quarter and it made a return accordingly and paid its taxes on the basis of what it thought was its tax liability. Its expectations were warranted by subsequent events because in the last three quarters of 1952 it had taxable gross receipts in excess of $11,000 and incurred a tax liability in excess of $235. It is, therefore, clear that the exemption provided by § 58-639 cannot be applied until the carrier's gross yearly earnings for the tax year have been

ascertained and the carrier should not be penalized for its good faith in making timely payments to the State subject to be adjusted after the carrier's yearly earnings from operations have been ascertained. Had the trend shown by this carrier's operations for the first quarter continued throughout the remaining three quarters for 1952, it would have been totally exempt from the payment of any tax despite its expectations that each ensuing quarter would be better than the previous quarter. In such circumstances should a carrier who pays taxes to the State be penalized because he expected to gross more than $5,000? No justice can be seen in that position, and we do not believe that the legislature intended that taxpayers be penalized for promptness and good faith.

"* * * The honest taxpayer can estimate his gross receipts quarterly and pay taxes on that basis knowing that any mistakes which he may have made can be rectified in his final quarterly return for the year * * *. During this period the State has the use of his money and the tax burden is spread over an operating year. Should the taxpayer be required to pay taxes on a quarterly basis and risk the running of the statute of limitations from each quarter, no doubt he will make nothing more than token payments during the first three quarters and await the ascertainment of his final tax liability before making any substantial payment. This practice would not be in the interest of either the taxpayer or the State. The taxpayer would be required to make large tax payments at the end of the year or after audit by the Commission and the State would be deprived of the use of the money for at least three-fourths of the year. Unless such an interpretation is demanded by the words of the statute, and clearly it is not here, it is not in the public interest that it be adopted."

Cross having filed his application for refund within the time required by Code, § 58-1122, is entitled to recover $350.98, and therefore the order of the Commission so directing is affirmed.

*Affirmed.*