## CIRCUIT COURT OF THE CITY OF WINCHESTER

American Woodmark Corp.

v.

City of Winchester
and Lacky G. Sempeles,
Commissioner of Revenue
of the City of Winchester,
in his individual capacity

September 21, 1994

Case No. (Law) 93-291

BY JUDGE JOHN E. WETSEL, JR.

This case came before the Court for trial on September 16, 1994, on the Petition for refund of personal property taxes imposed by the City. The parties appeared with their counsel: French Slaughter and Leon Szeptycki for the Petitioner and Mark Flynn and Collins Denny, III, for the Defendants. The Stipulation of Facts was accepted by the Court, and all prefiled exhibits were admitted into evidence. After argument of counsel, the court took the case under consideration and has now decided to grant the peti-

tion for refund of the taxes and to deny the civil rights claim against the Commissioner of Revenue.

*I. Findings of Fact*

The parties stipulated to the following facts.

American Woodmark Corporation is a Virginia corporation with its corporate headquarters located within the geographical boundaries of the City of Winchester, Virginia. This corporate headquarters facility was in use by American Woodmark during the period at issue, calendar years 1989 to 1992, inclusive. American Woodmark corporation has no subsidiaries or affiliates and is a publicly traded company.

Functions performed at the corporate headquarters of American Woodmark in the City of Winchester include establishing and monitoring overall corporate direction and strategy, overall management of American Woodmark's business, consolidated reporting of its financial information, approving extensions of credit to prospective customers, selling and marketing of cabinets and vanities produced by other American Woodmark facilities, invoicing sales, collecting accounts receivable, paying purchase invoices, maintaining a company wide computer network, and fulfilling the accounting, tax and regulatory compliance functions required to manage and operate the company's business activities.

American Woodmark's employees at its corporate headquarters in the City of Winchester consist of executive officers and their clerical assistants, accounting personnel, credit management personnel, information systems (or computer) management and operators, senior sales and marketing personnel, operations and customer service personnel, and senior manufacturing officers. Attached to these stipulations as Exhibit 1 is a representative list of American Woodmark personnel and job titles with reporting responsibilities shown. Employees and job titles have changed over the period at issue. The present list is provided only to illustrate the nature of the work-force at the corporate headquarters of American Woodmark.

American Woodmark does not engage in the actual production of cabinets and vanities at its corporate headquarters in the City of Winchester or any other location within the geographical boundaries of the City of Winchester.

The location of each of American Woodmark's facilities and the classification of the types of activity conducted by American Woodmark at each such facility are as follows:

A. *Corporate/Administrative Offices*
Corporate Headquarters

3102 Shawnee Dr., Winchester, VA 22601

*Marketing Services*

1655 Tyson Rd., Winchester (Frederick County), VA 22601
(Closed 9/92 and relocated to Corporate Headquarters)

*Product Development*

110-G Industrial Dr., Winchester (Frederick County), VA 22601 (Closed
9/92 and relocated to Corporate Headquarters)

B. *Assembly Facilities*

109 Byrd Ave., Berryville, VA 22611
1017 Highway 42 S., Jackson, GA 30233
4475 Mohave Airport Dr., Kingsman, AZ 86401
307 Rifle Range Rd., Wetumpka, AL (Closed 3/90)

C. *Component Manufacturing Plants*

Rt. 220 South, Industrial Park, Moorefield, WV 26836
117 Southford Rd., Moorefield, WV 26836
281 Kentucky Rd., Orange, VA 22960
Rt. 2, Box 358, Meadowbrook Industrial Park, Eastanollee, GA 30538

D. *Distribution Centers*

1120 Atlanta Industrial Dr., Suite C, Marietta, GA 30062 (Closed 3/93)
5357 Crosswind Dr., Columbus, OH 43228 (Closed 2/91)
155 Alexandra Way, Carol Stream, IL 60187 (Moved 1/93)
2551 Allan Dr., Elk Grove Village, IL (1/93-9/93)
12790 East 38th Ave., Denver, CO 80237 (Closed 12/91)
1255 La Quinta Dr., Suite 230, Orlando, FL 32809
1248 Avenue R, Grand Prairie, TX (Moved 12/91)
905 Avenue S, Grand Prairie, TX 75050 (12/91-Present)
2620 East Francis St., Ontario, CA 91761
1350 Energy La., Ste. 102, St. Paul, MN 55108 (Closed 3/90)
1625 Tysons Dr., Winchester (Frederick County), VA 22601 (Closed
3/93)
4977 Allison Parkway, Vacaville, CA 95688
3526 E. Broadway, Phoenix, AZ 85040 (Became Service Center 11/90)

E. *Service Centers*

4401 S. Pinemont, Ste. 216, Houston, TX 77041 (3/89-Present)
3831 East LaSalle, Phoenix, AZ 85040 (11/90-Present)
5190 S. Valley View Blvd., Suite 101, Las Vegas, NV 89118

F. *Sales Offices*

450 East Devon Ave., Ste. 225, Itasca, IL 60143 (8/90-6/93)
16885 W. Bernado Dr., Suite 230, San Diego, CA 92127 (1/89-12/90)
1120 Atlanta Industrial Dr., Suite B, Atlanta, GA 30066

Certain of the above locations were closed, opened or relocated during the time period relevant to this proceeding. In these instances, the date such facilities were opened, closed or relocated is indicated under the respective location for each classification of business facility provided above. The activities of the various locations are described below.

*Orange, Virginia.* This facility initially handles all solid wood product used by American Woodmark. Personnel attached to the Orange facility control all solid wood purchases which are generally in the form of random width, rough cut lumber, one inch or more in thickness. Oak is the predominant species of lumber, although cherry and maple are also purchased by the Orange facility. These hardwood purchases are the largest dollar category of American Woodmark material purchases. After purchase, the Orange facility dries the lumber in predriers and then in dry kilns for about 30 days each. The lumber is then dressed and cut at Orange into the width and length dimensions required by American Woodmark for its cabinets and vanities. Dressing involves planing the wood to produce smooth surfaces. The only further operation performed at Orange is gluing together smaller wood pieces to produce solid wood panels. All product produced at the Orange facility is shipped to the Hardy County, West Virginia, facility.

*Hardy County, West Virginia.* This facility receives the Orange, Virginia, facility's wood products and purchases paint and plywood from outside vendors, all of which it uses to manufacture and paint or stain the solid wood and plywood components of American Woodmark's cabinets and vanities. These components include front frames for the cabinet or vanity, doors, drawers, and hardwood shelves. American Woodmark does not manufacture or sell counter tops.

Components are then shipped from the Hardy County facility to the Moorefield, West Virginia, facility and to American Woodmark's assembly

facilities. For the Moorefield, West Virginia, facility, Hardy County also manufactures finished door moldings without panels.

*Toccoa, Georgia.* This facility purchases from outside vendors paint and 4 feet by 8 feet sheets of particle board. It prints a wood grain finish on the particle board and then cuts it into strip stock for cabinet tops, bottoms, backs and sides and drawer sides, backs and bottoms. It ships the particle board strip stock to American Woodmark's assembly facilities. Strip stock produced from particle board is cut to required widths, but not to required lengths. A channel is also cut into strip stock for drawer sides and backs to receive and support drawer bottoms.

*Moorefield, West Virginia.* This facility has several somewhat diverse functions. It purchases glass insert panels and inserts them into door moldings supplied by Hardy County to produce glass panelled cabinet doors which it ships to American Woodmark's assembly facilities. It packages and ships to customers replacement cabinets components to replace defective components. It purchases cabinet accessories from outside vendors and finishes, repackages and ships them to American Woodmark's assembly facilities. It packages and ships to American Woodmark's sales representatives sample cabinet fronts.

*Berryville, Virginia; Jackson, Georgia; and Kingman, Arizona.* Each of these three facilities does essentially the same thing. They are the assembly facilities, which are supplied with cabinet and vanity component parts by the Hardy County, West Virginia; Toccoa, Georgia; and Moorefield, West Virginia, facilities. In addition to receiving component parts, these facilities purchase hardware, cartons, glue, wood veneer and fasteners from outside vendors. The objective of these facilities is to assemble the component parts into finished cabinets and vanities and to package them for shipment to either American Woodmark's customers or its distribution warehouses. This objective is accomplished as follows for a typical cabinet.

(1) Particle board strip stock is cut to desired lengths and attached to the sides and back of the cabinet frame with glue and "s-clips." If true wood grain is desired on any side, painted wood veneer is glued to the particle board.

(2) Particle board or wood strip stock is cut to desired lengths for drawer bottoms, sides and backs which are then assembled into drawers using the drawer fronts produced at Hardy County. Purchased metal channeling is attached to the drawer sides to allow them to slide freely in and out of the cabinet on metal tracks attached to the cabinet sides.

(3) Particle board strip stock is cut to the lengths desired for cabinet shelves.

(4) Door frames supplied by Hardy County are affixed to the front of the cabinet frame, and doors supplied by Hardy County are hung from hinges attached to the door frame. If a glass panelled door is desired, it will have been supplied by Moorefield. If a "frameless" cabinet is desired, no frame is used and the door is hung by hinges from the cabinet side.

(5) Drawers and shelves are then inserted in the cabinet.

(6) Base cabinets and vanities are shipped from the assembly facilities without counter tops, since American Woodmark does not produce or sell counter tops. If a purchase contract requires counter tops, American Woodmark will attempt to subcontract the construction of the countertops and job-site installation of the cabinets and counter tops.

*Marietta Georgia (3/93); Columbus, Ohio (2/91); Carol Stream/Elk Grove, Illinois (9/93); Denver, Colorado (12/91); St. Paul, Minnesota (3/90); Winchester (Frederick County), Virginia (3/93); Grand Prairie, Texas; Orlando, Florida; Ontario, California; and Vacaville, California.* These are all distribution facilities with warehouses. Some have been closed since the month and year indicated in parentheses. Additional distribution facilities with warehouses are located at assembly facilities. Each serves the same function as part of a geographically disbursed distribution network which allows American Woodmark to guarantee delivery anywhere in the country within a week. Each distribution facility is responsible for the maintenance of its inventory, which is supplied by the assembly facilities, and for responding to purchase orders received from customers via American Woodmark's service centers and sales offices.

*Houston, Texas; Phoenix, Arizona (opened 11/90); Las Vegas, Nevada; Itasca, Illinois (8/90 - 6/93); San Diego, California (1/89 - 12/90); and Marietta, Georgia.* These are all service centers or sales offices. Some were only in operation during the periods indicated in parentheses. Additional sales offices are located at the distribution centers, including the distribution centers which are operated at the assembly facilities. These offices receive and process all customer orders for American Woodmark's cabinets and vanities.

All facilities are hooked into a computer network which is controlled by and operates through a large mainframe computer located at American Woodmark's corporate headquarters in the City of Winchester, Virginia. The computer system is used to provide data and information to the appropriate company personnel to enable them to make informed decisions

and to manage their areas of responsibility. The functions of the computer system are to efficiently perform various clerical functions, to manipulate and display data in desired formats, to transmit information within and between all American Woodmark facilities and to generate and produce invoices and checks. Specifically, the computer system serves the following purposes.

(a) The computer system transmits to each assembly facility orders for cabinets and vanities to be assembled at that facility and provides the means through which the assembly facilities order component parts from the component plants at Hardy County, West Virginia; Toccoa, Georgia; and Moorefield, West Virginia.

(b) The computer system transmits to each distribution center orders for cabinets and vanities to be shipped by it and provides the means through which the distribution centers control their inventory and order cabinets and vanities from the assembly facilities.

(c) The computer system provides information to all facilities to assist them in purchasing raw materials and supplies.

(d) Once products are shipped, the shipping location (assembly plant or distribution center) enters this information into the computer system. An invoice is generated by the computer in the City of Winchester and is mailed to the customer from the corporate headquarters in Winchester. The issuance of the invoice also causes an account receivable to be created by the computer system in American Woodmark's Accounts Receivable System. The invoice instructs the customer to mail payment to American Woodmark's lock box located at and maintained by NationsBank in Charlotte, North Carolina. Once the bank receives the customer's payment, it is deposited in American Woodmark's account with NationsBank and the Credit Department at the corporate headquarters in Winchester is notified. Also, copies of all payments are mailed to the Credit Department. This information is entered into the computer system by the Credit Department in order to update the Accounts Receivable System by reflecting customer payments. NationsBank holds all funds received by it in American Woodmark's account in Charlotte, North Carolina, until the Treasury Department located at the corporate headquarters in Winchester instructs NationsBank how to apply the funds.

(e) Each facility is responsible for ensuring that it has adequate components and supplies to produce or supply the products ordered from its facility. A Requirements Planning System, maintained on the computer and based upon parameters established by each receiving facility, automat-

ically generates internal orders to be supplied by other American Woodmark facilities. However, the receiving facility is still responsible for ensuring that the correct orders are generated by the computer and that inventory shortages and excesses do not occur. The receiving facility can influence the quantities automatically ordered by the computer by adjusting order quantities, minimum inventory levels, and adequate stock requirements. It is the responsibility of the receiving facility to ensure that it receives the proper product and has an adequate inventory of such product.

(f) Customer orders are received by customer service representatives at American Woodmark service centers, sales offices and at the corporate headquarters and are entered into the computer system by the customer service representatives. The computer system accepts or rejects a customer's orders based on credit limits and the current status of the customer's account. Entered orders within the customer's credit limit are shipped from either a distribution facility or an assembly facility. Orders received at distribution facilities are filled and shipped from the distribution facility inventory. Orders received at assembly facilities are automatically entered into a computer generated scheduling system to be produced and shipped to the customer.

(g) Each American Woodmark assembly facility and distribution facility is responsible for directing shipments to customers for all orders directed to that facility. The computer system tracks when and where each order is shipped on the basis of information entered into the computer at the shipping location.

(h) The responsibility for controlling inventory belongs to the local management of each individual American Woodmark facility which regularly stocks an inventory of American Woodmark products or materials. Personnel at each facility enter into the computer system information on product and material receipts and shipments and the computer system manipulates this information in order to provide a perpetual inventory system which reports on-hand balances, receipts, and shipments of all raw material and finished good items and of certain work-in-process items. Each location is also responsible for counting actual on-hand inventory and comparing it to the perpetual inventory record. Any differences between the computer's perpetual inventory record and the physical count are verified and adjusted by the location.

(i) The computer system is not directly used in product design activities or other research and development activities.

(j) The computer system is not used in the determination of the price for which American Woodmark is willing to sell its cabinets and vanities. However, once those prices have been established they are entered into the computer system and are used by it to extend prices on individual orders and generate invoices.

(k) American Woodmark maintains two payroll systems on the computer system. Both are controlled at the corporate headquarters in Winchester. The two payroll systems are the hourly payroll system and the salary payroll system. Following is a summary of each.

*Hourly Payroll System.* Every American Woodmark facility that has hourly employees must set up the employees' records in the hourly payroll computer system, maintain their pay rates, track their hours worked, and enter all information necessary to generate a check. The Treasury Department at the corporate headquarters is responsible for scheduling and coordinating the processing of all locations' hourly payrolls. The hourly payroll checks are printed and signed at the corporate headquarters in Winchester and mailed by the Treasury Department to each location for distribution to its hourly employees.

*Salary Payroll System.* The Treasury Department at the corporate office in Winchester is responsible for all aspects of paying salaried employees.

(l) Each American Woodmark facility is responsible for purchasing the goods and services it uses. When a purchase is to be made, the purchasing facility must enter all necessary information into the computer's purchasing system, which then generates a purchase order. The purchase order shows the name of the vendor, the quantity and type of products ordered, and the agreed upon price. The purchase order is printed and signed at the facility which initiates the purchase. When the goods are received, the facility's receiving clerk enters all receiving information into the computer purchasing system. This information includes the name of the vendor, the product, and the quantity received. The vendor's invoice is mailed directly from the vendor to the Accounts Payable Department located at the corporate headquarters in Winchester. The accounts payable clerk at the corporate headquarters enters the vendor's detailed invoice into the computer's accounts payable system. The computer system then matches the purchase, receiving report and the vendor invoice. If all these agree, a check is generated by the computer, is signed, and is mailed from the corporate headquarters in Winchester. If there is a discrepancy between any of the information entered into the computer system, the computer will reject the invoice and the accounts payable clerk will notify the pur-

chasing facility which then has the responsibility to resolve the discrepancies.

(m) The computer system is not directly used to analyze customer reaction to American Woodmark's products or to institute any production changes in response to such information.

American Woodmark products are sold on a nationwide basis to independent distributors and directly to home centers, major builders and home manufacturers. If a purchase order is to be shipped from inventory, the order is scheduled for shipment from one of the American Woodmark distribution centers. If the order is to be produced by one of American Woodmark's plants, the order is transmitted to the corporate headquarters in Winchester via their computer network, to be entered into the production schedule of one of the assembly plants. Once the product is shipped to the customer, the shipping location enters all shipping information into the mainframe computer system located at the American Woodmark corporate headquarters in Winchester. The shipping information causes an invoice to be generated at the corporate headquarters and the invoice is mailed to the customer. The customer in turn remits his payments to a lock box located in Charlotte, North Carolina, for deposit in an American Woodmark account at NationsBank. The bank mails the deposit information to the corporate headquarters in Winchester so American Woodmark can record the cash receipts on an accounts receivable ledger. Disbursement from the American Woodmark account at NationsBank in Charlotte is controlled by the corporate headquarters in Winchester.

For each of the years 1989 to 1992, American Woodmark filed a City of Winchester "Business Schedule" with defendant Lacky G. Sempeles, Commissioner of Revenue for the City of Winchester, reporting personal property of American Woodmark located in the City of Winchester. (Copies of the returns are attached to Petitioner's Application for Correction of Erroneous Assessment of Local Tax as Exhibits A, C, E, and G.)

On the basis of the information supplied on the "Business Schedule" by American Woodmark for the years 1989 to 1992, defendant Sempeles billed American Woodmark for personal property taxes for each of these years for all items of property listed on the "Business Schedules." American Woodmark paid to defendant City of Winchester the personal property taxes assessed against it.

Subsequent to filing its return for the years 1989 to 1992 and paying the taxes due thereon, American Woodmark timely filed a request for refund including amended returns for the years 1989 to 1992 pursuant to Va.

Code § 58.1-3980 with defendant Sempeles seeking refunds of tangible personal property tax as follows:

| Year | Nontaxable Furniture, etc. at Original Cost | Refund Request |
|------|---------------------------------------------|----------------|
| 1989 | $5,349,641 | $123,715 |
| 1990 | $5,925,812 | $122,906 |
| 1991 | $6,250,000 | $113,460 |
| 1992 | $6,471,136 | $104,556 |
|      |            | $464,637 |

The refund request was based on American Woodmark's contention that no tangible personal property tax is properly assessed by the defendant City of Winchester on any tangible property used by American Woodmark in its facilities in the City of Winchester other than machinery and tools, motor vehicles and delivery equipment. American Woodmark does not contest taxation of the property listed by it on the "Business Schedules" as machinery and tools, or as trucks, tractors, and trailers.

The City of Winchester admits that each amount of refund requested by American Woodmark is correctly computed to reflect the amount of personal property tax for the relevant tax year which is attributable to the property claimed by American Woodmark as not subject to personal property tax, although the City of Winchester does not admit that such property has been properly classified as furniture, fixtures and equipment not subject to tax.

Defendant Sempeles acting in his capacity as Commissioner of Revenue for the City of Winchester denied American Woodmark's requested refund of personal property taxes for calendar years 1989 to 1992. The reason he stated for that denial are given in his April 20, 1993, letter to American Woodmark, a copy of which is attached to the stipulation as Exhibit 2.

Defendant City of Winchester has not provided by ordinance for the payment of interest on the refund of erroneously assessed taxes.

## II. Conclusions of Law

1. Va. Code § 58.1-1100 separates for taxation by the state, and not by localities, "intangible personal property." The state, while reserving intangible personal property, referred to commonly as "capital not otherwise taxed," to itself for potential taxation, has elected not to tax this class of

property and has allowed local governments to tax the "machinery and tools, motor vehicles and delivery vehicles" of "manufacturing businesses." Virginia Code § 58.1-1101, in what may be the apogee of oxymoronic language in the Code of Virginia, defines "intangible personal property" for Virginia tax purposes as follows:

> § 58.1-1101. *Classification, rate of tax* — A. The subjects of taxation classified by this section are hereby defined as intangible personal property . . . .
>
> 2. *Capital which is personal property, tangible in fact, used in manufacturing*, mining, radio or television broadcasting, dairy, dry cleaning or laundry *businesses*. Machinery and tools, motor vehicles and delivery equipment of such businesses shall not be defined as intangible personal property for purposes of this chapter and shall be taxed locally as tangible personal property according to the applicable provisions of law relative to such property. [Emphasis supplied.]

Tangible personal property is all personal property which is not classified as intangible personal property under Virginia Code § 58.1-1100 *et seq.*, or as merchant's capital under Virginia Code § 58.1-3510. Virginia Code § 58.1-3500. Section 58.1-3507 provides that "machinery and tools used in a manufacturing business" is property "subject to local taxation only." This case turns upon whether the computers, office fixtures, and office equipment in American Woodmark's corporate headquarters are "machinery and tools used in a manufacturing business." The City contends that since American Woodmark does no actual manufacturing in the City that the tangible personal property in question cannot be "personal property, tangible in fact, used in [a] manufacturing" business.

The Virginia classification of capital for tax purposes has evolved from including all tangible personal property "employed in" virtually every trade or business in the base for the tax on intangible personal property (Acts 1918, ch. 101, p. 171), to including in the base only tangible personal property "used or employed in" manufacturing and certain other businesses (Acts 1964, ch. 423, p. 691, and subsequent amendments to § 58-412), and finally to excluding from all state tax tangible personal property "used in" manufacturing and certain other businesses (Acts 1982, ch. 633, p. 1064 at 1078). In *Commonwealth v. Pembroke Limestone Works*, 145 Va. 476, 481, 134 S.E. 717 (1926), the Supreme Court was deciding whether certain personal property of the defendant was "capital" or "tan-

gible personal property" under earlier tax classification statutes, and the Supreme Court affirmed the trial court's determination that the property was "capital" stating:

> The property consisted of machinery, tools, and other property necessary for the operation of the plant. [The plant was in Giles County, and the company's headquarters was in Roanoke.] . . . . The tangible personal property consists of steam shovels, drills, dinkey engines, crushers, screens, belts, induction motors, pumps, pipes and the like.

Under the tax statutes at that time, there was a provision that "machinery and tools not taxed as real estate" was "capital." This case illustrates the type of machinery and tools originally contemplated by the General Assembly when it first enacted the classification of "machinery and tools." While the statutes have changed, the General Assembly has continued to use the classification of "machinery and tools" in the state tax statutes. "Every item of the property in controversy was used as part and parcel of the plant, and was necessary for the convenient and proper operation of the plant . . . ." *Id.* at 486. The personal property in controversy in this case is not at one of the Petitioner's manufacturing plants, like in *Pembroke Lime Works*, rather it is at the corporate headquarters, which in *Pembroke* was in Roanoke, where presumably Pembroke Lime's office equipment was at the time.

2. The proposition relied on by the City that tax exemptions are to be construed strictly against the taxpayer, and that the taxpayer has the burden of establishing entitlement to an exemption, is not applicable here. *Compare Commonwealth v. Wellmore Coal Corp.*, 228 Va. 149, 320 S.E.2d 509 (1984); *Commonwealth v. Pounding Mill Quarry*, 215 Va. 647, 650, 212 S.E.2d 428, 430 (1975). Sections 58.1-1100 and 58.1-1102(A)(2) do not exempt from tax property which would otherwise be subject to taxation. Rather, they classify and define what property is to be segregated for taxation solely by the Commonwealth. Therefore, this is not about an exemption but rather a *limitation on the City's authority to tax*, and the standard of strict constitution is applied against the City and not the taxpayer. *See Commonwealth v. General Electric Co.*, 236 Va. 54, 64, 372 S.E.2d 599, 605 (1988); *Commonwealth v. Herbert*, 127 Va. 291, 298, 103 S.E. 645, 647 (1920).

Tax statutes are to be construed against the taxing authority. The Supreme Court of Virginia has declared that "it is well-settled and familiar

law that statutes imposing taxes are to be construed most strongly against the government, and in favor of the citizen . . . . Whenever there is a just doubt, 'that doubt should absolve the taxpayer from his burden'." *Commonwealth Natural Resources, Inc. v. Commonwealth*, 219 Va. 529, 537, 248 S.E.2d 791, 796 (1978) (holding that franchise tax on gross receipts and special taxes were improperly assessed on public service corporation since there was no clear legislative intent to impose franchise tax on gross receipts); *Commonwealth v. Appalachian Electric Power Co.*, 193 Va. 37, 46, 68 S.E.2d 122, 127 (1951) ("such statutes are not to be construed to include within the subjects taxed anything which is not clearly intended by the legislature to be so included"). Moreover, in construing the scope of the limitation, this Court should be cognizant of the policy in Virginia to promote manufacturing and should therefore construe its definition broadly. *See County of Chesterfield v. BBC Brown Boveri, Inc.*, 238 Va. 64, 69, 380 S.E.2d 890, 893 (1989).

While the City states that its Commissioner's assessment of tax is presumed to be correct and valid, the Virginia Supreme Court has stated that the presumption of correctness "is only prima facie and subject to rebuttal. In fact, it is little more than a starting point, and does not in any measure relieve the courts of the responsibility and duty of careful review, which the right of appeal itself implies." *Commonwealth of Virginia, ex rel. County of Wise v. Interstate Railroad Co.*, 175 Va. 53, 61, 7 S.E.2d 130, 133 (1940). *Accord Arlington City Board v. Ginsberg*, 228 Va. 633, 325 S.E.2d 348 (1985); *Clarke Associates, etc. v. County of Arlington*, 235 Va. 64, 369 S.E.2d 414 (1988). Where it is established that the assessment is imposed in error, the burden is shifted to the City to maintain its right of recovery. *Talley v. Commonwealth*, 127 Va. 516, 103 S.E. 612 (1920).

3. The City claims that American Woodmark's business in the City is not part of a manufacturing business, but rather American Woodmark is engaged in four different businesses — manufacturing, assembling, distribution, and sales. Manufacturing is an activity which "[transforms] the new material into an article or a product of substantially different character." *Solite Corp. v. King George County*, 220 Va. 661, 663, 261 S.E.2d 535, 536 (1980). *See also County of Chesterfield v. BBC Brown Boveri, Inc.*, 238 Va. 64, 69, 380 S.E.2d 890, 893 (1989). The term manufacturing is to be construed liberally because "the public policy of Virginia is to encourage manufacturing in the Commonwealth," and, "when a party is engaged in both manufacturing and non-manufacturing activities, it will nonetheless be classified as a manufacturer for tax purposes if the manu-

facturing portion of its business is substantial." *County of Chesterfield v. Brown Boveri, supra* at 69 and 65. The Commissioner of Revenue may not vivisect a Virginia business into its component activities in order to maximize taxes. *See City of Norfolk v. Griffin Brothers*, 120 Va. 524, 91 S.E. 640 (1917). American Woodmark is engaged in the integrated manufacturing business, because it transforms raw materials into cabinets, which is an article of "substantially different character" from the original raw wood and other materials.

A manufacturer does not alter its status as a manufacturer because it also sells its products.

> The marked distinction between a manufacturer and a merchant is that the merchant or dealer sells to earn a profit, and the manufacturer sells to take profit already earned. He must buy the materials out of which to make his finished product, and he must sell the product of his factory after it is finished. But such dealings are not his occupation.

*Commonwealth v. Meyer*, 180 Va. 466, 471, 23 S.E.2d 353, 355 (1942) (quotations omitted).

The fact that American Woodmark does not engage in any production activities at its headquarters facility in the City of Winchester does not alter American Woodmark's status as a manufacturing business. The corporate headquarters facility is clearly part of that manufacturing business. The functions of the headquarters include overall management of American Woodmark's manufacturing business, consolidation and reporting of its manufacturing financial information, collection of accounts receivable, credit approval, payment of purchase invoices, filing of all federal, state and local taxes, and operation and maintenance of the mainframe computer operations utilized by all American Woodmark facilities nationwide. These activities are all integral to any manufacturing business. Such management, sales, financial and other administrative activities are no less important to a manufacturer's ability to operate profitably than the manufacturing of its product. American Woodmark as a company, including the corporate headquarters in Winchester, is a manufacturing business.

4. Section 58.1-1102(A)(2) defines all tangible personal property used in a manufacturing business (other than machinery, tools, motor vehicles, or delivery equipment) as intangible personal property. Virginia Attorneys General have consistently opined that a variety of tangible personal property owned by manufacturers but not used in the manufacturing process

itself still constitute intangible personal property not subject to local taxation. *See* Attorney General's Opinion to Shirley L. Wheeler, March 5, 1992, Attorney General's Ann. Rep. 165 (1992) ("business equipment, such as copiers, computers, fax machines and telephones, while tangible in fact, is defined by § 58.1-1101(A)(2) as intangible personal property when it is used in a manufacturing business"); Attorney General's Opinion to Wayne L. Carter, April 29, 1988, Attorney General's Annual Report 590 (1987-88) (equipment used in research and development by manufacturer more likely to be intangible personal property than machinery or equipment); Attorney General's Opinion to Hardaway Marks, November 15, 1977, Attorney General Ann. Rep. 411 (1977-78) (boat owned by a manufacturer is capital taxable only by the Commonwealth).

"Machine" means "an apparatus consisting of interrelated parts with separate functions, used in the performance of some kind of work." "Machinery" means "an assemblage of machines or mechanical apparatuses: *the machinery of a factory.*" *Random House Unabridged Dictionary* (2d ed. 1993). "Machinery and tools used in a manufacturing business" are not defined by statute or case law. However, the Attorney General has opined that "machinery and tools used in a manufacturing business are the machinery and tools which are necessary in the particular manufacturing business and *which are used in connection with the operation of the machinery which is actually and directly used in the manufacturing process.*" 1985-86 Va. Atty. Gen. Rep. 338 (emphasis added): the term machine means "a complex combination of mechanical parts," and the term tool means "an instrument of manual operation." Attorney General's Opinion to Wayne Carter, April 29, 1988, Attorney General's Annual Report 590 (1987-88). The Attorney General has further opined that machinery and tools "used in a manufacturing . . . business" mean machinery and tools "necessary in the particular manufacturing business and which are used in connection with the operation of machinery which is actually and directly used in the manufacturing process." *Id.* "[C]onstruction of a statute by a State official charged with its administration is entitled to great weight." *Winchester T.V. Cable Co. v. State Tax Comm'r*, 216 Va. 286, 290, 217 S.E.2d 885 (1975).

"The meaning of particular terms in a statute may be ascertained by reference to words associated with them in the statute. It is also a familiar policy in the construction of terms of a statute to take into consideration the meaning naturally attaching to them from the context and to adopt that sense of the words which is best harmonized with the context." 73 Am.

Jur. 2d, *Statutes*, § 231. In *Cape Henry Towers v. National Gypsum Co.*, 229 Va. 596, 603, 331 S.E.2d 476 (1985), the Supreme Court construed Virginia Code § 8.01-250, the statute of repose limiting actions arising out of defects of real property, and stated: "We cannot, however, consider statutory language out of context . . . ." Subsection 2a of the statute is a clear illustration of the point that the legislature knows how to further expand the class of property subject to local taxation when it so desires. Accordingly, both the "machinery" and the "office furniture and equipment" of "cable television businesses" are subject to local taxation. Obviously, machinery does not mean furniture and office equipment such as computers, otherwise the additions to Subsection 2a add nothing to the statute. The Virginia Supreme Court is very reluctant to read requirements or additions into statutes which are not expressed. *See Makarov v. Commonwealth*, 217 Va. 381, 228 S.E.2d 573 (1971). "For this Court to place any limitation on the clear and comprehensive language of the statute, or to create an exception where none exists under the guise of statutory construction, would be to defeat the purpose of the enactment and to engage in judicial legislation." *Town of Crewe v. Marler*, 228 Va. 109, 114, 319 S.E.2d 748 (1984).

In *Tultex v. City of Martinsville*, 238 Va. 59, 338 S.E.2d 6 (1989), the Supreme Court held that computers used by a manufacturing business were subject only to state taxation under the predecessor to § 58.1-1101(A)(2), and the court's analysis of the state-local taxation dichotomy in that case is instructive:

> "The General Assembly may define and classify taxable subjects." Va. Const., art. X, § 1. As the parties correctly stipulated, the only types of property local governments are empowered to tax are real estate, tangible personal property, machinery and tools, and merchants' capital. Va. Const., art. X, § 4; former Code §§ 58-9, 58-412. See generally *Roanoke v. Michael's Bakery Corp.*, 180 Va. 132, 143-54, 21 S.E.2d 788, 793-98 (1942) (comprehensively discussing history of segregation and classification of personal property for taxation).
>
> Intangible personal property, on the other hand, has been "segregated for State taxation only," Code § 58-405, and "the subjects of taxation classified by [Chapter 8 of Title 58] are . . . defined as intangible personal property," *id.* Among the subjects so classified and defined in Chapter 8 is "[p]ersonal property, tangible in fact, used or employed in a manufacturing . . . busi-

ness . . . [which] shall be included in capital." Code § 58-412 (1974 Repl. Vol.) (emphasis added).

Martinsville contends that we should construe Code § 58-412 to mean property used or employed by its owner in a manufacturing business. To support its contention, Martinsville argues that because personal property taxes are assessed against the owner, Code § 58-20, and the owner, BameriLease, is in the leasing business and not the manufacturing business, the Computer Equipment is taxable as tangible personal property to the owner.

We do not agree. We conclude that *the test* set forth in Code § 58-412 [the predecessor to § 58.1-1101] *is whether the property is in fact "used or employed in a manufacturing . . . business," not necessarily how the owner uses the property.*

When the General Assembly "has spoken plainly" on a subject, we must not "change or amend its enactments under the guise of construing them." *Carter, Adm'r v. Nelms*, 204 Va. 338, 346, 131 S.E.2d 401, 406 (1963) (quoting *Winston v. City of Richmond*, 196 Va. 403, 407-08, 83 S.E.2d 728, 731 (1954)); *accord Portsmouth v. Chesapeake*, 205 Va. 259, 269, 136 S.E.2d 817, 825 (1964) (a statute's "plain meaning is to be accepted without resort to rules of interpretation"). As stated previously, the parties stipulated that "[t]he Computer Equipment was personal property, tangible in fact, used or employed in a manufacturing business." This stipulation tracks the exact language of Code § 58-412. Thus, when Code §§ 58-405, 58-411, and 58-412 are read together, *their plain language states that the Computer Equipment "shall be included in capital" and is deemed to be intangible personal property "segregated for State taxation only."* *Id.* at 62-63. (Emphasis added.)

While the facts were stipulated to in *Tultex*, the logic of the Supreme Court is compelling. Computers and office equipment in a corporate headquarters of a manufacturing business are machines, but they belong to the broad class of "personal property, tangible in fact, used in a manufacturing business" and are therefore capital, they are not "machinery and tools" subject to local taxation. While a computer in a plant could be an integral part of manufacturing machinery, being part of "an assemblage of machines," that is not the type of computer at issue in this case.

American Woodmark's computers at its headquarters now do the work that clerks would have done at the time when the tax statutes first began using the classification of "machinery and tools." This term was in the tax statutes in 1918, 1964, 1982, and 1984, when these statutes were substantially revised as noted by the City. From 1918 to the present, the use of office equipment has increased geometrically, but the General Assembly has yet to add the designation of "office equipment" to the class of tangible personal property of manufacturing business, which may be taxed by local government units.

5. *Demurrer.* In considering a demurrer the Court must apply "the settled rule that a demurrer admits the truth of all well-pleaded material facts. All reasonable inferences fairly and justly drawn from the facts alleged must be considered in aid of the pleading." *Russo* v. *White*, 241 Va. 23, 24, 400 S.E.2d 160 (1991), quoting *Fox* v. *Custis*, 236 Va. 69, 71, 372 S.E.2d 373 (1988). *Accord Fun v. Virginia Military Institute*, 245 Va. 249, 252, 427 S.E.2d 181 (1993). The Supreme Court recently reviewed the principles governing the trial court's ruling on a demurrer in *Cater-Corp, Inc. v. Catering Concepts, Inc.*, 246 Va. 22, 431 S.E.2d 277 (1993), in which it stated:

> "A demurrer admits the truth of all material facts properly pleaded. Under this rule, the facts admitted are those expressly alleged, those which fairly can be viewed as impliedly alleged, and those which may be fairly and justly inferred from the facts alleged." *Rosillo v. Winters*, 235 Va. 268, 270, 367 S.E.2d 717 (1988). "On demurrer, a court may examine not only the substantive allegations of the pleading attacked but also any accompanying exhibit mentioned in the pleading." *Flippo v. F & L Land Co.*, 241 Va. 15, 17, 400 S.E.2d 156 (1991).
>
> When a motion for judgment or a bill of complaint contains sufficient allegations of material facts to inform a defendant of the nature and character of the claim, it is unnecessary for the pleader to descend into statements giving details of proof in order to withstand demurrer. *Hunter v. Burroughs*, 123 Va. 113, 129, 96 S.E. 360, 365 (1918). And, even though a motion for judgment or a bill of complaint may be imperfect, when. it is drafted so that defendant cannot mistake the true nature of the claim, the trial court should overrule the demurrer; if a defendant desires more definite information, or a more specific state-

ment of the grounds of the claim, the defendant should request the court to order the plaintiff to file a bill of particulars. *Alexander v. Kuykendall*, 192 Va. 8, 14-15, 63 S.E.2d 746, 749-50 (1951).

Having examined Count V of the petition, which is a claim against Sempeles under 42 U.S.C. 1983, and drawing "all reasonable inferences fairly and justly drawn from the facts alleged . . . in aid of the pleadings," it would appear that the Petition did not state a civil rights right of action against Sempeles. Therefore, for the reasons hereafter stated, Sempeles' Demurrer is sustained. However, even if the demurrer had been overruled, the facts in this case did not prove a right of action under 42 U.S.C. § 1983.

6. *Civil Rights Action.* Section 1983 originated as part of the Ku Klux Act of 1871 as an exercise of Congress' power to enforce the Fourteenth Amendment to the U.S. Constitution. *Monroe v. Pape*, 365 U.S. 167, 171, 81 S. Ct. 473, 475, 5 L. Ed. 2d 492, 496 (1961). It creates a "species of tort liability" for violations of certain federal rights. *Imbler v. Pachtman*, 424 U.S. 409, 417, 96 S. Ct. 984, 988, 47 L. Ed. 2d 128, 136 (1976). A successful plaintiff can recover not only damages, but also attorney's fees pursuant to 42 U.S.C. § 1988.

The nature of a Section 1983 action has been described by the U.S. Court of Appeals for the Fourth Circuit as follows:

> The essential elements to be proved in any section 1983 action are (1) that the defendant was acting under color of state law in the actions complained of; and (2) that the defendant deprived plaintiff of a right, privilege or immunity secured by the Constitution or laws of the United States. If there is no violation of a federal right, there is no basis for a section 1983 action . . . .

*Clark v. Link*, 855 F.2d 156, 161 (4th Cir. 1988) (citation omitted). Section 1983 claims are generally based upon denial of rights found in the First, Fourth, Fifth, and Fourteenth Amendments to the U.S. Constitution, and they are most frequently due process and equal rights protection claims.

The Fourth Circuit, in deference to the essential elements, has held that a Section 1983 action cannot be based alone on a violation of state law — or even on an intentional violation of state law. *Id.* at 163. This prohibition against the use of Section 1983 to bootstrap state law claims into claims for damages and attorney's fees under Section 1983 has been uniformly

followed by the federal courts. *E.g., Brown v. Grabowski*, 922 F.2d 1097, 1113 (3d Cir. 1990); *Doe v. Connecticut Department of Child and Youth Services*, 911 F.2d 868, 869 (2d Cir. 1990); *Pesce v. J. Sterling Morton High School*, 830 F.2d 789, 795 (7th Cir. 1987). Moreover, the Supreme Court has specifically held that violations of state law do *not* constitute "a denial of due process; otherwise, every erroneous decision by a state court on state law would come here as a federal constitutional question." *Gryger v. Burke*, 334 U.S. 728, 731, 68 S. Ct. 1256, 1258, 92 L. Ed. 1683 (1948).

To succeed in its Section 1983 claim, American Woodmark must point to some federal right that has been violated by Sempeles' failure to take action on American Woodmark's application for a refund of personal property taxes voluntarily paid by American Woodmark upon its furniture, fixtures and computer equipment located in the City of Winchester. The U.S. Supreme Court has rejected arguments that imposition of a state-authorized tax upon personal property located within the state violates federal law. *See R. J. Reynolds Tobacco Co. v. Durham County*, 479 U.S. 130, 107 S. Ct. 499, 93 L. Ed. 2d 449 (1986); *see also Wisconsin v. J. C. Penney Co.*, 311 U.S. 435, 61 S. Ct. 246, 85 L. Ed. 2d 267 (1940).

The Commissioner of Revenue's enforcement of an erroneous interpretation of state law does not rise to the level of denial of due process. "We cannot treat a mere error of state law, if one occurred, as a denial of due process." *Gryger v. Burke*, 334 U.S. 728, 731, 92 L. Ed. 1683, 68 S. Ct. 1256 (1948).

7. *Commerce Clause.* In *Dennis v. Higgins*, 498 U.S. 439, 111 S. Ct. 865, 870, 112 L. Ed. 2d 969 (1991) (Nebraska motor vehicle taxes), the Supreme of the United States held that the Commerce Clause of the United States Constitution "confers 'rights, privileges, or immunities' within the meaning of [42 U.S.C.] § 1983" and that:

> [I]ndividuals injured by state action that violates this aspect of the Commerce Clause [impose a substantial burden on interstate commerce] may sue and obtain injunctive relief. See, *e.g.,* *McKesson Corp. v. Division of Alcoholic Beverages and Tobacco*, 496 U.S. [18], 110 S. Ct. 2238, 2247, 110 L. Ed. 2d 17 (1990) .... We have also recently held that taxpayers who are required to pay taxes before challenging a state tax that is subsequently determined to violate the Commerce Clause are entitled to retrospective relief "that will cure any unconstitutional

discrimination against interstate commerce during the contested tax period." *Id.,* 110 S. Ct., at 2258.

The United States Supreme Court's decisions under the Commerce Clause present a long history of judicial adjustment to a constantly evolving system of commerce, which is ever increasing in its complexity. As Justice Frankfurter observed, Commerce Clause "opinions must be read in the setting of the particular cases and as the product of preoccupation with their special facts." *Freeman v. Hewit,* 329 U.S. 249, 252 (1946). Time has done little to simplify the law under the Commerce Clause, as Justice Scalia just observed in his concurring opinion in *West Lynn Creamery, Inc. v. Mass. Dept of Food and Agriculture,* _____ U.S. _____, 62 U.S.L.W. 4518, 4525-4526 (1994) (All milk sold was subject to an assessment which was then distributed to in-state producers, and this was unconstitutional discrimination.) in which he reviewed the state of Commerce Clause restrictions:

Applying this approach — or at least the second part of it — is not always easy, since once one gets beyond facial discrimination our negative-Commerce-Clause jurisprudence becomes (and long has been) a "quagmire." *Northwestern States Portland Cement Co. v. Minnesota,* 358 U.S. 450, 458 (1959). See generally D. Currie, The Constitution in the Supreme Court: The First Hundred Years 1789-1888, pp. 168-181, 222-236, 330-342, 403-416 (1985).

There are at least four possible devices that would enable a State to produce the economic effect that Massachusetts has produced here: (1) a discriminatory tax upon the industry, imposing a higher liability on out-of-state members than on their in-state competitors; (2) a tax upon the industry that is nondiscriminatory in its assessment, but that has an "exemption" or "credit" for in-state members; (3) a nondiscriminatory tax upon the industry, the revenues from which are placed into a segregated fund, which fund is disbursed as "rebates" or "subsidies" to in-state members of the industry (the situation at issue in this case); and (4) with or without nondiscriminatory taxation of the industry, a subsidy for the in-state members of the industry, funded from the State's general revenues. It is long settled that the first of these methodologies is unconstitutional under the negative Commerce Clause. See, *e.g., Guy v. Baltimore,* 100

U.S. 434, 443 (1880). The second of them, "exemption" from or "credit" against a "neutral" tax, is no different in principle from the first, and has likewise been held invalid. *See Maryland v. Louisiana*, 451 U.S. 725, 756 (1981); *Westinghouse Electric Corp. v. Tully*, 466 U.S. 388, 399-400, and n. 9 (1984). The fourth methodology, application of a state subsidy from general revenues, is so far removed from what we have hitherto held to be unconstitutional, that prohibiting it must be regarded as an extension of our negative-Commerce-Clause jurisprudence and therefor, to me, unacceptable. See *New Energy Co. of Indiana v. Limbach*, 486 U.S. 269, 278 (1988). Indeed, in my view our negative-Commerce-Clause cases have already approved the use of such subsidies. See *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 809-810 (1976).

None of the four prohibited tax scenarios are presented by the case at bar. The Winchester tax is nondiscriminatory, and the proceeds are placed in the city's general revenue funds and are not earmarked for any special purpose. Writing for the majority, Justice Stevens stated: "Nondiscriminatory measures, like those at issue here, are generally upheld, in spite of any adverse effects on interstate commerce . . . . However, when a nondiscriminatory tax is coupled with a subsidy to one of the groups hurt by the tax . . ." it is then unconstitutional. *Id.* at 4522-23. In the case at bar, no rebate or subsidy to in-state or in-city manufacturers exists, and the tax is applied uniformly to all manufacturers, similarly situated as American Woodmark, regardless of whether they are in-city, in-state, or out-of-state.

Goods produced or manufactured in a state intended for interstate commerce may still be taxed locally. *Coe v. Errol*, 116 U.S. 517, 527, 6 S. Ct. 475, 29 L. Ed. 715 (1886); *see also County Bd. v. Arcade-Sunshine Co.*, 196 Va. 916, 86 S.E.2d 162 (1955). An *ad valorem* tax on goods produced in a state may be taxed by that state without violating the Commerce Clause. *Heisler v. Thomas Colliery Co.*, 260 U.S. 245, 43 S. Ct. 83, 67 L. Ed. 237 (1922) (tax on coal produced in Pennsylvania).

American Woodmark rests its civil rights claim against the defendant, Lacky G. Sempeles, upon its allegation that Sempeles denied its request for tax refunds solely on the ground that it "did not have an actual production facility located in the City [of Winchester]." American Woodmark's Memorandum in Opposition to Defendant Sempeles' Demurrer ("American Woodmark's Memorandum") at page 5. American Woodmark refers to Virginia Code § 58.1-1101(A)(2), stating that it "requires only

that the capital [tangible personal property which is statutorily defined as intangible personal property] be 'used' in the manufacturer's business." American Woodmark's Memorandum, 5.

American Woodmark claims that Commerce Clause and Fourteenth Amendment violations arise under the United States Constitution from Sempeles' interpretation of § 58.1-1101(A)(2), however, American Woodmark only argued the Commerce Clause leg of its claim, stating that "The Supreme Court has long held that taxes imposed by states or localities that discriminate against interstate commerce violate the Commerce Clause." American Woodmark's Memorandum, 6. American Woodmark relies on cases striking down tax schemes which discriminate against out-of-state taxpayers in favor of in-state taxpayers on the principal that:

> "It long has been established that the Commerce Clause of its own force protects free trade among the States . . . . One aspect of this protection is that a State 'may not discriminate between transactions on the basis of some interstate element' . . . . That is, a State may not tax a transaction or incident more heavily when it crosses state lines than when it occurs entirely within the State." *Armco, Inc. v. Hardesty*, 467 U.S. 638, 642, 81 L. Ed. 2d 540, 104 S. Ct. 2620 (1984).

The purpose is to create a regime in which "the borders between the States are essentially irrelevant." *Commonwealth Edison Co. v. State of Montana*, 453 U.S. 609, 618, 69 L. Ed. 2d 884, 101 S. Ct. 2946 (1981).

American Woodmark's constitutional theory equates state borders to city limits. It attacks on federal constitutional grounds a statutory interpretation which treats alike each person who is engaged in a manufacturing business and who has no manufacturing facility within the Winchester city limits, so the challenged interpretation simply does not rise to the level of Commerce Clause concern. Therefore, Virginia's own political process, and not the Commerce Clause, must be relied upon for the remedy.

8. American Woodmark's personal property at issue here is property, tangible in fact, classified by the Virginia General Assembly for tax purposes as intangible personal property and subject to taxation only by the Commonwealth, because the property is used by American Woodmark in its manufacturing business, and it is not machinery and tools subject to local taxation. Va. Code §§ 58.1-1100 and 58.1-1101(A)(2). The property in question consists of furniture, computers, and office fixtures at the corporate headquarters, and its use is an integral part of American Wood-

mark's manufacturing business. The disputed property is unquestionably "personal property, tangible in fact, used in [a] manufacturing business."

9. The fact that American Woodmark's actual production facilities are not located in the City of Winchester, but rather are located elsewhere in Virginia or out of state, does not alter the conclusion of law. Contrary to the City's contention in refusing to grant American Woodmark its refunds, Section 58.1-1101(A)(2) imposes no such geographic requirement. Section 58.1-1101(A)(2) unambiguously refers to property "used in manufacturing businesses," without drawing any significance from the locations of the various aspects of the manufacturing business.

Altering the definition of intangible personal property because all of American Woodmark's production facilities are outside of the City, and some outside of the Commonwealth, also would be contrary to the Supreme Court's decision in *Morris & Co. v. Commonwealth*, 116 Va. 912, 83 S.E. 408 (1914). The taxpayer there was an out of state meat processor with a distribution center in Roanoke. The Commonwealth sought to impose a merchant's license tax on the Roanoke distribution center. The license tax statute at issue included the following proviso: "nothing in the foregoing shall be construed as requiring a company selling the products of their own mines or lands or manufactures to pay merchant's license tax for so doing." *Id.* at 918. The taxpayer was deemed a manufacturer for purposes of this section, but the Commonwealth assessed the tax anyway because the taxpayer only sold its products in Roanoke and the manufacture of the meat products took place elsewhere. The court held that the manufacturer's provision applied to resident and non-resident manufacturers alike, pointing out that the non-resident manufacturer "cannot be discriminated against in favor of resident manufacturers, but stands on exactly the same footing as resident manufacturers," and that "[h]ere the law makes no discrimination between resident and non-resident manufacturers." *Id.* at 919. Similarly, Section 58.1-1102(A)(2) makes no such discrimination between resident and non-resident manufacturers.

10. The City's assessment and refusal to refund taxable personal property tax to American Woodmark is erroneous, and the Court hereby orders that the tax paid by American Woodmark be refunded to American Woodmark for 1989 in the amount of $123,715, for 1990 in the amount of $122,906, for 1991 in the amount of $113,460, and for 1992 in the amount of $104,556 pursuant to Va. Code §§ 58.1-3987 and 58.1-3988.

11. Interest may not be awarded on a tax refund by the city in the absence of an ordinance promulgated by the city under Virginia Code § 58.1-3987. *Commonwealth v. Safe Deposit and Trust Co.*, 155 Va. 458, 153 S.E. 897 (1930). Since there is no such city ordinance, there is no award of prejudgment interest.

### III. Decision

For the foregoing reasons:

1. Defendant Sempeles's Demurrer to the 42 U.S.C. § 1983 rights of action is sustained.

2. The City shall refund to the Petitioner the sum of $464,637.00 with interest there on from October 1, 1994, until paid.